THOMAS B. LOVE, NEXT FRIEND, ET AL. v. CITY OF DALLAS.

No. 5633.   Decided May 16, 1931.
(40 S. W., 2d Series, 20.)

352

*H. Bascom Thomas, Jr.* and *W. J. Rutledge, Jr.,* both of Dallas, for appellants.

The constitutional requirements concerning equal and uniform taxation are not violated by the statute which makes no provision for the levying of any tax whatever, and merely deals with the apportionment or disbursement of funds appropriated by the Legislature, and made available to the county board of trustees, and the state board of education for use in providing adequate and proper schooling to individual pupils.

Article 2678a involved in this suit is a proper exercise by the Legislature of the powers conferred upon it under article 7, section 1 of the Constitution, imposing the duty upon the Legislature of the state to establish and make suitable provision for the support and maintenance of an efficient system of public free schools.

The public free schools in the state of Texas are state institutions. Those situated in the independent district, comprising the city of Dallas, are under the supervision of the state board of education, and must conform to the acts of the Legislature. The fixing of a maximum tuition charge for attendance upon any of such schools is the proper exercise of the functions of the Legislature.

Section 5 of article 11 of the Constitution of Texas, under which the city of Dallas adopted its present charter, provides that such charter shall be, "subject to such limitations as may be prescribed by the Legislature, and providing that no charter or any ordinance passed under said charter, shall contain any provision inconsistent with the Constitution of the state or of the general laws enacted by the Legislature of this state." A provision in the charter of the city of Dallas, that such city shall have exclusive dominion and control of the public schools within the city limits proper and within the territorial limits for school purposes, cannot be held to deprive the Legislature of the state, and the state board of education, and the county board of school trustees, of their power of supervision and direction over the schools located within such independent district. Such a charter provision must be construed so as to give effect to the constitutional powers of the Legislature, and to subordinate the so-called school management to the general management provided by the state.

The public free schools in the city of Dallas are state schools. When property tax paying voters of the independent district, acting under the authority permitted by the Legislature, vote funds in addition to those provided by the state for the maintenance of public free schools in such districts, they contribute to a state school. Neither the independent district, nor its citizens may as a result of such contribution, oust the state from its control over such schools, or interfere with the right of the Legislature to fix a maximum tuition charge for attendance thereon. Constitution, art. 7, sec. 1; Constitution, art. 7, sec. 3; Constitution, art. 7, sec. 5; Article 2678a, Revised Civil Statutes, enacted by the 40th Legislature, Acts 1927, page 259, chap. 181, sec. 1; Revised Civil Statutes, title 49, chap. 10; Revised Civil Statutes, title 49, chap. 11; Revised Civil Statutes, title 49, chap. 12; Webb County v. Board of School Trustees of Laredo, 65 S. W., 878; Megargel County, etc. v. Blewett, 278 S. W., 516, 285 S. W., 271.

*James J. Collins,* City Attorney, *A. A. Long, W. H. Knight, H. P. Kucera,* Asst. City Attys., all of Dallas, and *Black & Graves,* of Austin, for appellee.

The issue in the case is not whether the Legislature has the power to provide free schools for the children of the state. The existence of that power is freely conceded. The duty to make such provision is devolved upon the Legislature by the Constitution. But the obligation is state-

wide. The question at issue is whether the burden of that obligation can lawfully be discharged by shifting its weight to the people of a given section of the state.

The duty to provide free tuition for all of the children of the state rests upon all of the people of the state. No one has ever supposed that free schools are not paid for by some one. They are intended to be free to the children but they cannot be free to the taxpayers.

The question in this case is whether under the Constitution the Legislature can force the people of a given district to provide free schools for the children of another district, using for that purpose funds that have been raised in the district, agreeably to the Constitution, for the exclusive benefit of the children of that district,—funds in which the non-resident children have no beneficial interest.

The challenged statute is invalid because it attempts to divert local school funds, derived from local taxation, from the channel into which such funds have been committed by the Constituion. The Constitution authorizes the formation of independent school districts and authorizes the levying of taxes therein for the benefit of the school children residing therein. The effect of this statute is to misappropriate those funds and to subject them to a use other than that to which they have been dedicated by the Constitution. Article VII, sections 1 to 6, inclusive, Texas Constitution; Article XI, section 10, Texas Constitution; Milam County v. Bateman, 54 Texas, 153; Simpson v. Pontotoc Co. Line School District, 275 S. W., 449 (writ of error refused); Houston v. Gonzales Ind. School Dist., 229 S. W., 468; Mills County v. Brown County, 85 Texas, 392; Parks v. West, 102 Texas, 11; Crabb v. Celeste Ind. School Dist., 105 Texas, 195.

We do not deny the power of the Legislature to say how the available fund may be applied within the county. But we do deny that the Legislature may say in what proportion it may be distributed among the scholastics of the county. The Constitution has committed to the legislative discretion of the determination of the manner of applying, expending or devoting the fund to the uses designated in the Constitution. But the Legislature may not designate the beneficiaries of the fund, nor may it determine the basis of distribution among them. Some purpose must be ascribed to the authors of the Constitution in respect to their choice of language. It should not be assumed that the terms were loosely chosen. In the same sentence the Constitution designates how the fund shall be distributed and by what authority it may be applied for the benefit of the distributees named in the Constitution. This court has repeatedly held that the county available fund and the portion of the state available fund distributable to the counties belong in beneficial ownership to the school children of the county. Parks v. West, 102 Texas, 11; Houston v. Gonzales, 229 S. W., 467; Simpson v. Pontotoc District, 275 S. W., 449.

It is one thing to name the distributees of the fund and it is a different thing to designate the manner in which the fund shall be applied for the benefit of the distributees. In setting apart the fund for the benefit of designated distributees according to a definite proportion, a declaration of trust is effected. In committing to the Legislature the discretion to say how the trust shall be administered for the benefit of the distributees, the Constitution does not grant to the Legislature the power of revoking or modifying the trust, or the power to change the beneficiaries, or the power to change the basis of distribution among them.

We have purposely referred at once to the several sections of article VII of the Constitution rather than to any isolated section of that article. The true meaning of the Constitution cannot be ascertained by looking to any isolated section while disregarding all of the others bearing upon the same subject. This law cannot be upheld on the ground that it constitutes a legislative attempt at compliance with section 1 of article VII. The Legislature has no power while attempting to discharge the duty devolved upon it by section 1 to override the other sections of article VII. The general duty must be performed not in disregard of, but in conformity with, the other provisions of the Constitution, equally mandatory. Parks v. West, 102 Texas, 11; Crabb v. Celeste Ind. Dist., 105 Texas, 194. The general charter embraced in section 1 of the education article of the Constitution must be exercised agreeably to the more specific provisions of the same article. The latter designate "the mode and manner" in which the general duty set forth in section 1 is to be performed. Parks v. West; Crabb v. Celeste, etc., supra.

Nor is the question concluded by the general statement contained in the opinion by Judge Gaines in Webb County v. Laredo, 95 Texas, 131, to the effect that in one sense the county school officers are officers of the state. Neither is the problem solved by merely announcing that the schools in the Dallas district are state schools and not city or district schools. True enough, they are state schools, and in a limited sense the officials are state officers. But this general assertion contributes nothing to a solution of the problem. The school children residing within the Dallas district are the wards of the state in respect to their rights guaranteed by the Constitution no less than are the school children residing in the rural districts. The Constitution does not inveigh against them because they reside in an urban rather than a rural community. On the contrary, the Constitution forbids that the Legislature in attempting to discharge the general duty of providing an adequate school system for all of the children of the state shall attempt to accomplish that result by taking from any of the school children of the state funds the beneficial title to which has been vested in them by the Constitution. If the Constitution forbids the Legislature to take from any of the school children of the state their pro rata share of the state apportionment money and forbids

a taking from them of their portion of the county available fund—both of them constitutional funds dedicated to uses not subject to diversion by the Legislature—it is inconceivable that the Constitution permits an invasion by the Legislature of local school funds created for the benefit of the children of a given district formed agreeably to the Constitution.

It has been broadly stated on occasion that the state apportionment money belongs to the state; that the schools belong to the state; and that the county available funds belong to the state. In truth and in fact, the funds belong to the children of the state in the proportion in which such funds have been set apart for them by the Constitution. As is stated by the court in Milam County v. Bateman, 54 Texas, 153, 164-165, there was a time when by reason of the language of the 1869 Constitution, as distinguished from that of the 1866 Constitution, some doubt might have been felt concerning the beneficial ownership of the county lands, but that doubt was effectually removed by the plain and forceful language of the 1876 Constitution, (now) section 6, article VII, by which said lands and the proceeds therefrom when sold are declared to be a trust fund for the benefit of the schools therein. It is said that they "are of right the property of said counties, respectively". It cannot be doubted that the county available fund has been devoted to a use that may not be changed by the Legislature. Simpson v. Pontotoc County Line School Dist., 275 S. W., 449. This court said in Houston v. Gonzales Ind. School District that the property of the school district belonged to the people thereof. It was merely held in trust for them by the Board of Trustees. The court did not say that the property belonged to the State of Texas, or to the people of the entire state. The court said that it belonged to the people of the district—for school purposes, of course. That was but another way of saying that the property belonged to the school children of the district. If it belonged to them, they, in virtue of their beneficial ownership, were entitled as of right to the exclusive enjoyment of all of the fruits of ownership. Stephens County v. Mid-Kansas Oil & Gas Co., 113 Texas, 160.

Mr. Chief Justice CURETON delivered the opinion of the court.

This suit was brought as a class bill on behalf of certain minor high school students who reside in Dallas county, but outside of the city of Dallas, as one class, and on behalf of other students who reside in the counties of Rockwall, Fannin, and Tarrant as another class. None of the complaining scholastics are located in districts which have high schools or maintain high school facilities, and the purpose of the suit was to require the Dallas school board to admit both classes of students into the Dallas city high schools. The relators predicate the right asserted by them on what is known as the high school tuition law. The city of Dallas is a municipal corporation, chartered under the laws of the state, has assumed control of its public schools, and as such is to be regarded as an

independent school district. We shall, therefore, in this opinion, as a matter of convenience, use the terms "district" and "school district" as embracing all classes of school districts, including cities, towns, and villages which have assumed control of their public schools or have been incorporated for school purposes.

The city of Dallas assumed control of its public schools many years ago, and now operates them under a special law which controls in minor respects, but in the main, in so far as here involved, the general laws are to be applied. A local school tax has been levied for the support of the public schools of the city, and many millions of dollars raised by bonds issued by the city have been invested in building sites, buildings, and equipment for the public schools, all based on local taxation, as provided by the Constitution and laws of this state. For a further statement of the case we refer to the opinion of the Court of Civil Appeals, 23 S. W. (2d) 431.

We are required at the threshold of this investigation to determine whether or not the high school tuition law applies to both the classes named in the bill. We are of the opinion that it was not the intention of the Legislature to make this act applicable to scholastics non-resident of the county in which they seek to attend a high school, except within the limitation of the transfer statute. Article 2697. We will not copy at length the high school tuition law, since it is available, but will state such of its terms as we think necessary. The act provides that the county board of school trustees at a regular meeting in May of each year shall classify the schools of the county "for the purpose of promoting the efficiency of the elementary schools and establishing and promoting high schools at convenient and suitable places." In making the classification the Board is required to give due regard to the schools already located, the distribution of population, etc. In the event any school is so classified that a resident high school student "within the free school age" cannot receive instruction in his home district, his tuition for the number of months attended "in any other high school recognized by either county or state" shall be paid by his own district. The act then provides: "If the high school attended *receives the transfer of state and county funds for said student,* credit shall be given for the amount of same. The rate of tuition charged said pupils shall be the actual cost of teaching service, based upon the average monthly enrollment in the high school attended, exclusive of all other current or fixed charges, not to exceed $7.50 per month." (Italics ours). Acts 41st Leg. (1929), First Called Session, chap 2, sec. 1 (Vernon's Ann. Civ. Stat., art. 2678a).

The law contains provisions by virtue of which, in case a district from which the high school pupil is transferred is not able to pay his tuition in the district to which he is transferred, the state shall pay the excess amount. The enactment contains some other matters which, in the main,

are simply for the purpose of putting into effect the plan which we have briefly outlined. The last sentence of the measure provides that a district to which a high school pupil has been transferred "shall not be required to accept such a *high school transfer* as provided in this act" until the sending district levies a certain specified tax. (Italics ours).

The high school tuition act was passed by the 41st Legislature (1st Called Sess., chap. 2), but is substantially the same as the act of the 40th Legislature, chap. 181, which it repealed, except it raised the maximum tuition provided for from $5 to $7.50 per month. The effect of both acts was to substitute their provisions severally for article 2678, R. S., 1925, which was a section of chapter 36, General Laws of the 34th Legislature, codified in chapter 11, title 49, of the R. S., 1925. These acts named treated the same subject matter as article 2678; in fact copied a portion of that article, and must be regarded as amendments only of that article and of the chapter of the Revised Statutes of which it was a part. Board of Education v. Haworth, 274 Ill., 538, 113 N. W., 939. The act of 1915, codified as chapter 11, title 49, R. S., 1925, was a comprehensive measure confiding county school affairs largely to a county board of trustees, and providing for a system of classified schools in each county. Section 3 of that measure became article 2678 of the Revised Statutes, which as amended is the act before us for review.

Section 4 of the original act of 1915, chapter 36, which as codified became article 2681 of the R. S. of 1925, also related to, and yet relates to, the powers and duties of the county trustees with respect to subdividing counties into school districts and making changes in district lines, etc. The last sentence in this article of the statute, as originally enacted in 1915, and as it now exists in the code, reads as follows: "In providing better schooling for the children and in carrying out the provisions of article 2678, the county superintendent shall, on the recommendation of the county school trustees, transfer children of scholastic age from one school district to another, and the amount of funds to be transferred with each child of scholastic age shall be the amount to which the district from which the child is transferred is entitled to receive."

When the Act of 1915 was passed, and the amendments to article 2678 enacted, the state already had a complete educational code, and these measures became a part of that code. All laws in *pari materia* must be construed together. 25 Ruling Case Law, p. 1060, sec. 285, p. 1063, sec. 287, p. 1067, sec. 291, 292; Ex parte Lipscomb, 111 Texas, 409, 417, 239 S. W., 1101, and cases cited; Houston Nat. Exch. Bank v. School Dist. (Texas Civ. App.), 185 S. W., 589; Hunt v. Whiteaker and Washington (Texas Civ. App.), 230 S. W., 1096. In view of this rule, which is one of universal acceptation, there is no escaping the conclusion that the sentence quoted from article 2681 is to govern and does apply to every scholastic affected by the terms of article 2678 as amended.

It means that the benefits of article 2678 (as amended) [article 2678a] are to be received by transfer, and if the scholastic is not one subject to transfer, the provisions of the article have no application. In fact, article 2678 as amended shows this on its face. This Act, among other things, declares, "if the high school attended *receives the transfer* of state and county funds for said student, credit shall be given for the amount of the same." (Italics ours). The last sentence in the amended Act declares: "Provided that the receiving district maintaining such a high school shall not be required to accept such a *high school transfer* as provided in this Act" * * * (Italics ours). It is perfectly plain from this language that under article 2678 it is contemplated that every one entitled to its benefits and subject to its provisions should be capable of receiving "such a high school transfer as provided in this act." In addition to the transfer provision above referred to, the statute at the time of the enactment of the law of 1915 contained, and at all times since has embraced, provisions for the "transfer of scholastics from one district to another." R. S. 1925, arts. 2695, 2696, 2697, 2698, 2699. These statutes as a part of the educational code of the state applied to article 2678 (R. S. 1925), and now apply to the statute here involved. We will not discuss all the terms of these transfer statutes. Article 2699 contains a general provision which declares: *"Except as herein provided, no part of the school fund apportioned to any district or county shall be transferred to any other district or county."* (Italics ours).

Article 2699 provides for consolidation and transfer in the case of county line districts, while article 2697 permits the transfer of a scholastic from a district in one county to an adjoining district in another county, upon a showing that the school in the district in which the pupil resides, on account of distance or some uncontrollable and dangerous obstacle, is inaccessible.

It is clear, we think, from a consideration of the various transfer statutes cited above, including the quoted provision from article 2681, that scholastics cannot be transferred, under any circumstances, from the district in which they reside to another district, except under the transfer statutes.

The construction placed by the Department of Education on article 2678, as amended, does not restrict the Act to students only who are subject to transfer, and the insistence is here made that students from Tarrant, Fannin, and Rockwall counties may attend the high school in Dallas, although they cannot be transferred under the transfer statutes. The ruling of the department is that there are three classes of non-transfer pupils who may become beneficiaries under the High School Tuition Law. These classes are:

" (a) Pupils who are within the scholastic age and, therefore, subject to transfer, but for whom no practicable arrangement can be made to

attend the high school of a district into which they are eligible to transfer.
\* \* \*

"(b)   Pupils within the scholastic age who have moved into a district subsequent to the taking of the scholastic census and are ineligible for transfer; and

"(c)   Pupils who are within the free school age, but above the scholastic age and not subject to transfer."   Texas School Laws, 1929, p. 17.

With this ruling we cannot agree.   The transfer statutes are a part of the law which governs the educational system, and article 2678 must be read in the light of these statutes.   We have shown that by article 2699 no part of the school fund apportioned to any district or county can be transferred to any other district or county, except as provided by the transfer statutes.   This is plain, unambiguous language, and any doubtful provision in article 2678 must be construed and limited by the language of the article, which has been previously quoted.   The general phrases of article 2678, as amended, such as, "the high school he (the scholastic) desires to attend", and shall have his tuition "paid", etc., "in any other high school recognized by either county or State", etc., must, like every other provision of this statute, be read and interpreted in the light of all statutes in *pari materia,* including those statutes which direct and specify the schools to which such a student may be transferred in accordance with the transfer statutes.

The suggestion in the departmental ruling referred to above that article 2678, as amended, gives the rights therein defined to pupils who are within the free school age but above the scholastic age, and therefore not subject to transfer, is erroneous.   Under the Constitution of this state (article 7) there cannot be a pupil "within the free school age but above the scholastic age".   The scholastic age in this state is over six and under eighteen at the beginning of the scholastic year.   Article 2902, R. S., 1925, as amended by Acts 1929, chap. 97, sec. 1 (Vernon's Ann. Civ. St., art. 2962), the article which has given rise to this erroneous construction, reads as follows:   "All children, without regard to color, over six years of age and under eighteen years of age at the beginning of any scholastic year, shall be included in the scholastic census and shall be entitled to the benefit of the public school fund for that year.   The board of school trustees of any city or town or independent or common school district shall admit to the benefits of the public schools any person over six and not over twenty-one years old at the beginning of the scholastic year, if such person or his parents or legal guardian reside within said city, town or district."

It will be noted that the portion of this statute defining the scholastic age declares that those within the age "shall be entitled to the benefit of the public school fund for that year." This provision is worded in language

long in use in the statutes of this state, and entitled the scholastic not only to the benefits of the public schools, but to the benefit of the public school fund. R. S., 1789, art. 3707; R. S., 1895, art. 3947; R. S., 1911, art. 2900. The subsequent portion of this article, to the effect that any person over six and not over twenty-óne, etc., shall be admitted "to the benefits of the public schools", is a provision which came into the statutes by the Act of 1913, p. 175, chap. 91, amending R. S., 1911, art. 2894, which was also in previous revisions, and permitted cities and towns which had voted local taxes to extend (as to them) the scholastic age and prescribe studies additional to those provided by law generally for free schools. R. S., 1879, art. 3789; R. S., 1895, art. 4029; R. S., 1911, art. 2894.

The codifiers in 1925 combined article 2900 of the R. S. of 1911 and article 2894 as amended in 1913, and made the two articles read as first quoted above. Had it been the purpose of the Legislature or the codifiers to admit pupils over eighteen and under twenty-one to the public schools free, they could have expressed that purpose by simply substituting the words "twenty-one" for "eighteen". But neither the Legislature nor the codifiers have done this, nor have they said that those between eighteen and twenty-one should have the benefit of the *"public school fund for that year"*. They have said merely that such students shall be admitted *"to the benefits of the public schools"*. Since the Legislature has used different words to express its meaning, we must conclude that the language employed was not intended to express the same meaning. The phrase "benefit of the public school fund", as used in our codes for more than fifty years, gave the student not only the benefit of the public schools, but of the public school fund as well. The words "benefits of the public schools" should be given a more restrictive meaning, and apply to those who are permitted to attend the public schools upon payment of tuition.

The Constitution requires that the available school fund shall be distributed to the counties of the state "according to their scholastic population". Constitution, art. 7, sec. 5. When this Constitution was written, and at all times subsequent to the Act of 1913, the term "scholastic population", as applied to the public free schools of the state, was well understood, and meant those who under the statutes of the state had the right to attend the public schools and receive the benefits of the public free school fund. If we say that article 2902, quoted above, gives those eighteen years of age and under twenty-one the same rights as free school scholastics, then manifestly the scholastic ages provided for by that statute would be all over six years of age and under twenty-one,—which is not only in direct conflict with the first sentence of the Act as quoted, but is in conflict with the general census and apportionment statutes of the state. R. S., 1925, arts. 2816, 2817, 2822, 2663.

If the Legislature had the right to fix the scholastic age at over six years and under eighteen, and at the same time decree that all not over

twenty-one could attend the public schools free, then the Legislature would have the same right and power to say that the scholastic age should be *over six and under eight*, and require the taking of a census of children only of those ages, and yet declare that all over six and under twenty-one could attend the public schools free, a statute which no one could seriously contend was constitutional. If we say those over eighteen and under twenty-one have the right to attend the public schools free, by virtue of this statute, although they have not been enumerated as scholastics entitled to the benefit of the free school fund, then it is obvious that the census statutes and apportionment statutes do not have the effect of apportioning the available school fund to the counties in accordance with the constitutional mandate that it shall be distriubted to the several counties according to their scholastic population, and they would, therefore, be void.

We deem it unnecessary to pursue the question further. It is too plain for argument that we must either say that pupils under eighteen and not over twenty-one are not to be regarded as free school pupils as of right, or we must say that our census and apportionment statutes are unconstitutional and void. This dilemma is easy of solution. It is plain enough that it is our duty to say that those over eighteen years of age and under twenty-one are not free school students as of right. Under article 2904 they may be admitted to the benefits of the public schools "on such terms as the trustees may deem proper and just", etc., but not otherwise.

For the reasons stated, we are compelled to say that article 2678, as amended, the high school tuition law, has no application whatever to students, either in or out of a county, who are not within the scholastic age,—that is, over six and under eighteen. This conclusion, of course, is one entirely consistent with all of the terms of article 2678 and the various transfer statutes, which show clearly that no students except those subject to transfer are entitled to the benefits of the high school tuition act.

It is obvious from what we have said that the student relators from Fannin, Tarrant, and Rockwall counties cannot be admitted to the high schools of Dallas county, unless they come within the terms of article 2697, permitting transfers to adjoining districts in other counties under certain conditions.

Our next inquiry will be as to whether or not the students resident of Dallas county must be admitted to the Dallas schools upon payment of the maximum tuition specified in article 2678 as amended and copied above. This inquiry at the outset involves the determination of the extent of the legislative power over the various school districts of the state and the property within those districts belonging to them for school purposes.

The school district has been the basis of the public school system of Texas from the days of the Republic to the present time, as evidenced by constitutional provisions, statutes, and judicial opinion. Hartley's

Digest, p. 78; Const. of the Republic, art. 8, sec. 2; Hartley's Digest, art. 891; Const. of 1861, art. 10, secs. 2, 5, Gammel's Laws, p. 24; Const. of 1869, art. 9, sec. 7, 7 Gammel's Laws, p. 418; Const. of 1876, art. 7, sec. .3, as amended in 1883, and subsequent amendments; Harris' Anno. Const., pp. 515, 518; Vernon's Anno. Const., vol. 2, p. 460; Act of August 13, 1870, 6 Gammel's Laws, p. 288; Act of April 22, 1871, 6 Gammel's Laws, p. 949; R. S., 1879, arts. 3746 et seq., arts. 3781 et seq.; R. S., 1925, arts. 3938 to 3956; R. S., 1911, title 48, chaps. 15, 16, 17 and 18; Article 2815 et seq., R. S., 1925, title 49, chaps. 11 and 13; (article 2676 et seq. and article 2741 et seq.), Vernon's Complete Texas Statutes (1928), title 49, chap. 19A (Vernon's Anno. Civ. Stat., arts. 2922a-2922l); Willis v. Owen, 43 Texas, 41, 49.

The lands and school buildings of the school districts of Texas and those of its cities have been derived from many sources. In part they have come from gifts and donations of land, labor, and money from the inhabitants of the school communities, districts, and cities of the state, as required or permitted by statutes. R. S., 1879, arts. 3771 to 3777; R. S., 1895, art. 3984. Funds for the purposes named were sometimes derived from lands originally donated to its municipalities by the Crown of Spain. 5 Gammel's Laws, p. 195. Sometimes lands came to counties for school purposes by will. Bell County v. Alexander, 22 Texas, 351, 73 Ann. Dec. 268. Occasional donations have been made in memory of some outstanding citizen, as evidenced by the gift of the Ball high school, costing hundreds of thousands of dollars, to the city of Galveston. The statutes from time to time have also provided that a certain amount from the available school fund apportioned to a school district or community could be used for building purposes. R. S., 1879, arts. 3771 to 3777; R. S., 1895, art. 3984. Local taxes have been levied for site and building purposes. 2 Gammel's Laws, p. 1336; 4 Gammel's Laws, p. 256; Acts of 1870 and 1871, sec. 3, 6 Gammel's Laws, p. 288, p. 949; R. S., 1879, arts. 3781, 3792; Constitution, art. 7, sec. 3, beginning with the amendment of 1883; Harris' Anno. Const., pp. 515, 517; Vernon's Anno. Const., art. 7, sec. 3; R. S., 1895, title 6, chaps. 10, 15, 16; R. S., 1911, title 48, chaps. 16, 17, and arts. 2874, 924, 925; R. S., 1925, arts. 2784, 2796, 2799, 1027, 1029, and art. 1175, sub secs. 15, 32. School districts and cities and towns for a long period of time have been authorized to issue bonds for the purchase of sites and erection of school buildings. Authorities supra; R. S., 1895, arts. 4034, 486; R. S., 1911, arts. 2837 to 2843, 2857, 2874, 924, 925; R. S., 1925, title 49, chap. 13, arts. 2784 to 2789, 2796, 2797, and art. 1175, sub secs. 10, 15, 32. The statutes have also provided that tuition fees of pupils not entitled to free tuition, and funds derived from "other local sources" could be used for building sites and erection of buildings. R. S., 1911, art. 2772; R. S., 1925, art. 2827. The amount which has been derived from the sources named and

invested in buildings, grounds, and equipment for the public schools we have no means of ascertaining. That it is very large all know. Official reports, however, show that from 1914 to 1930 the school districts and cities of the state issued bonds for the purchase of school sites and erection of buildings in the aggregate sum of $137,734,594, of which amount $30,-361,445 was issued by cities, such as Dallas, for school purposes. Reports of the attorney general for the years 1914-1916, pp. 54, 72; 1916-1918, pp. 59, 76; 1918-1920, pp. 70, 89; 1920-1922, pp. 51, 72; 1922-1924, pp. 76, 97; 1924-1926, pp. 79, 99; 1926-1928, pp. 51, 77; 1928-1930, pp. 70, 95.

The record in this case discloses that the city of Dallas has outstanding school bonds in the amount of $7,104,650, the proceeds of which were expended in providing building sites, buildings, and equipment for the public schools of the city.

The constitutional and statutory provisions under which the funds referred to above and under which sites have been obtained and school buildings erected during the entire history of our public schools are capable of no other construction than that these grounds so purchased and buildings so erected, though purchased and erected in view of and as a part of the method provided by the Legislature in its effort to establish and make suitable provision for the support and maintenance of an efficient system of free schools, were nevertheless so purchased and so erected for *the benefit of the immediate community, district, or city in which they were located.*

Section 3, article 7 of the Constitution since first amended in 1883 has provided that the local taxes may be *"levied and collected within such school districts for the further maintenance of public free schools and the erection of school buildings therein."*

The statutes prior to and since the adoption of this constitutional provision have been replete with provisions similar in purpose to that quoted.

Under the code of 1879 the title to the school properties within such city or town was vested in the mayor "in trust for the sole use of the public free schools established under this chapter." R. S., 1879, arts. 3781 to 3792.

District taxes voted under R. S., 1895, were for *"the further maintenance of public free schools and the erection within each school district of school buildings therein."* R. S., 1895, arts. 3938a, 3984.

Chapter 15, R. S., 1895 (article 3994 et seq.), relates to free schools in towns and villages. By article 3995 the trustees of towns and villages theretofore incorporated for school purposes were authorized to levy taxes "for the purpose of purchasing and constructing public free schools and sites *therefor within the limits of such incorporated district."*

The title to school properties in incorporated towns and cities which had assumed control of their schools, by the code of 1895 was to "be

vested in the board of trustees and their successors in office in trust for the use and benefit of the *public free schools in such city or town."* R. S., 1895, art. 4013.

In certain cities and towns the title was vested in the mayor in trust for the *sole use of the public free schools established in such cities or towns.* R. S., 1895, art. 4032.

Article 3909, R. S., 1895, provided that bequests and conveyances of property for public schools should vest the title in certain named officers *"as the trustees for those to be benefited thereby."*

Subsequent codifications were in effect similar to those we have mentioned above. Authorities, supra; R. S., 1911, arts. 2827, 2843, 2849, 2857, title 48, chap. 17, arts. 2874, 924; R. S., 1925, title 49, chap. 13, arts. 2772, 2784, 2796, 2799, 1027, 1028, and art. 1175, subs. 15, 32.

Early statutes, like the latest codification, provided that the school property of districts and cities should vest in certain trustees or officers *"as trustees for those to be benefited thereby",* or *"for the use and benefit of the public free schools in such city or town."* R. S., 1925, arts. 2756 2772; 9 Gammel's Laws, 572; 7 Gammel's Laws, p. 543; R. S., 1879, art. 3792. The various constitutional and statutory provisions cited also show that taxes levied in school districts and cities for school purposes were and are levied for the benefit of the district or city, or the inhabitants thereof, and not for the school system of the state generally. From the beginning that part of the available school fund apportioned to any district or community has remained its property, although not immediately used. Various statutes sustain this view. Paschal's Digest, art. 3538; R. C., 1879, art. 3732; R. S., 1895, art. 3935, sub. sec. e; R. S., 1911, art. 2770; R. S., 1925, art. 2831.

The statutes from 1879 to the present have clearly made those portions of the available school fund allocated to school communities, districts, and cities "special funds". R. S., 1879, art. 3720; R. S., 1895, arts. 3923, 3924, 3926, 3926a, 3926b, 3928, 3934, 3934a; R. S., 1911, arts. 2729, 2735, 2745; R. S., 1925, arts. 2835, 2837, 2665. Since, when the available school fund has been apportioned to the counties, districts, and cities entitled thereto, it becomes a *special fund,* it can not be diverted to any other use. Constitution, art. 8, sec. 7; Cooley on Taxation (4th Ed.), vol. 4, sec. 1819; School District v. Smith, 97 Ore., 1, 191 Pac., 506.

In view of the history of the subject and the statutory and constitutional provisions referred to above, it is plain, we think, that the property and funds of the public schools are held in trust by the city, district, county, or other statutory agency, to be used for the benefit of the school children of the community or district in which the properties exist, or to which the school funds have been allocated. We think these properties and funds are so plainly and clearly impressed with a trust in favor of the local public schools of the city or district that they are within the

protective claim of both the state and federal constituitons, and .that the Legislature is without power to devote them to any other purpose or to the use of any other beneficiary or beneficiaries. 24 Ruling Case Law, p. 593, sec. 47; Smisson v. State, 71 Texas, 222, 231, 9 S. W., 112; Milam County v. Bateman, 54 Texas, 153; Parks v. West, 102 Texas, 11, 17, 111 S. W., 726; Sun Mutual Ins. Co. v. Board of Liquidation, 31 La. Ann., p. 175; and other authorities *post*.

The insistence is made, however, that because the legislative power may be exerted to change the boundaries of school districts and cities, or to abolish them, that their school properties and funds are not protected by the due process and other clauses of the Constitution, and that, therefore, the relators may be given the privilege of attending the schools of Dallas upon such terms as the statute may prescribe. We shall examine these questions in the light of the facts of this case. The city of Dallas has more than $7,000,000 invested in school properties, paid or to be paid for by local taxation, and it raises each year by local school taxes more than $2,000,000. The cost per high school student in the Dallas schools in 1928-1929 was $13 per month (without taking into consideration the value of its buildings, etc.), of which amount $10.39 was for instructional service alone.

School districts are local public corporations of the same general character as municipal corporations. Thompson v. Elmo Ind. School Dist. (Texas Civ. App.), 269 S. W., 868, 870; Royse Ind. School Dist. v. Reinhardt (Texas Civ. App.), 159 S. W., 1010 (writ refused). They are defined as quasi-municipal corporations, and derive their powers by delegation from the state. They are state agencies, erected and employed for the purpose of administering the state's system of public schools. 24 Ruling Case Law, pp. 562 to 565, secs. 6 and 7. Generally it must be said that the Legislature may from time to time, at its discretion, abolish school districts or enlarge or diminish their boundaries, or increase or modify or abrogate their powers. 24 Ruling Case Law, p. 563, sec. 6, and cases cited in note 17; p. 566, sec. 9; Thompson v. Elmo Ind. School Dist., supra. Cities and towns and municipal corporations are of the same general nature as quasi-municipal corporations, in so far as here involved, and the right of the Legislature to create, abolish, enlarge, or restrict them in their territory or powers is, unless restrained by special constitutional provisions, similar to the authority of the Legislature over quasi-municipal corporations. Both are agencies of the government,—the one with a more limited sphere than the other. Cooley's Constitutional Limitations (7th Ed.), vol. 1, p. 393; Thompson v. Elmo Ind. School Dist., supra. This opinion necesssarily deals with both type of public corporations, and it is not believed that the rules of law as to school property rights are different. However plenary the powers of the Legislature may be over municipal and quasi-municipal corporations, there are well

recognized limitations. Cooley's Constitutional Limitations (7th Ed.), vol. 1, p. 488. Among these limitations is that which denies the power of the Legislature to impose debts and obligations not within the ordinary functions of municipal government. Cooley's Constitutional Limitations (7th Ed.), vol. 1, p. 495; Callan v. Saginaw, 50 Mich., 7, 14 N. W., 677; Hasbrough v. Milwaukee, 13 Wis., 37 80 Am. Dec., 718; People v. Batchellor, 53 N. Y., 128, 13 Am. Rep., 480; Asbury v. Albemarle, 162 N. C., 247, 78 S. E., 146, 44 L. R. A. (N. S.), 1189; People v. Chicago, 51 Ill., 17, 2 Am. Rep., 278.

Since the Constitution, art. 7, sec. 3, contemplates that districts shall be organized and taxes levied for the education of scholastics within the districts, it is obvious that the education of nonresident scholastics is not within their ordinary functions as quasi-municipal corporations; and under the authorities cited the Legislature is without power to impose such an obligation on them, without just compensation. Aside from this rule, the necessary implication from the constitutional provision is that the Legislature cannot compel one district to construct buildings and levy taxes for the education of nonresident pupils. The Legislature, by sec. 3, art. 7, is only authorized to permit school districts to impose taxes for these purposes for schools within the dictrict, and to say that the Legislature can compel a district to admit nonresidents without just compensation, would be permitting that department to do indirectly what it admittedly cannot do directly.

We pass now to a second limitation on the power of the Legislature, —that relating to municipal and quasi-municipal corporation property. The rule is that the ownership of such property is in the local district or municipality for the benefit of the public, within the boundaries of the district or municipality. The Legislature may control or dispose of the property without the consent of the local bodies, so long as it does not apply it in contravention of the trust. 25 Ruling Case Law, p. 581, sec. 30. The same rule applies to school funds as to other property. Such funds are trust funds for educational purposes. 24 Ruling Case Law, p. 593, sec. 47. The text cited declares: "School funds are held to be trust funds for educational purposes. Such funds do not belong to the district or to the officers of the dictrict, but are merely held by them in trust for the public. The courts will not permit school funds to be diverted to other even though closely kindred uses, no matter how meritorious the project may appear to be either in its practical or ethical or sentimental aspects. Even the legislature itself, the fountain head of matters educational, cannot divert school funds to other uses." 24 Ruling Case Law, pp. 593, 594, sec. 47, p. 592, sec. 45.

In section 48 the same authority declares: "School funds are not only impressed with a general educational trust, but in many cases they are impressed with a specific trust limiting their use to special educational

spheres, and in such case, of course, they can be used for no other." 24 Ruling Case Law, p. 594, sec. 48.

We think the Supreme Court of Arkansas, in the case of Pearson v. State, 56 Ark., 148, 19 S. W., 499, 35 American State Reports, correctly stated the rule as to legislative power over school districts, and over school district properties or other municipal properties. The court in part said:

"The statement that counties and school districts are agencies of the state, and therefore subject to legislative control or annihilation, is a misleading generality. The corporate entity is a legislative creation, and its powers may be restrained, its functions changed, or its existence destroyed, at the will of the legislature; but, in so far as it has acquired and holds property, it is but a trustee for the local public; and, although its powers be withdrawn or its existence ended, the property which survives it belongs to the same public, and must be, in some way, applied to its use. It has no contract right to exist as a corporation, but the public that it represented has a vested right in the municipal property acquired for its benefit, and is entitled to demand that such property be applied to its uses: Cooley's Constitutional Limitations (6th Ed.), 291; Lucal v. Board of Commrs., 44 Ind., 524; Skinkle v. Essex Road Board, 47 N. J. L., 93; Town of Milwaukee v. City of Milwaukee, 12 Wis., 93; Essex Public Road Board v. Skinkle, 140 U. S., 334, 11 S. Ct., 790, 35 L. Ed., 446; New Orleans v. New Orleans Water Works Co., 142 U. S., 79, 12 S. Ct., 142, 35 L. Ed., 943; Hasbrouck v. Milwaukee, 13 Wis., 50, 80 Am. Dec., 718; State v. Haben, 22 Wis., 660; People v. Hurlbut, 24 Mich., 95, 9 Am. Rep., 103; Board of Park Commrs. v. Common Council, 28 Mich., 228, 15 Am. Rep., 202; Spauling v. Andover, 54 N. H., 38; Trustees of Aberdeen Female Academy v. Mayor, etc., 13 Smedes & M. (21 Miss.), 645; 1 Dillon's Municipal Corporations, sec. 68a; Town of Guilford v. Supervisors, etc., 13 N. Y., 149." Pearson v. State, 56 Ark., 148, 19 S. W., 499, 500, 35 American State Reports, 91, 93.

Not only is this a correct statement of the rule, but it is the one accepted by the best writers and courts of the country. It is stated by Judge Cooley as follows:

"The rule upon the subject we take to be this: when corporate powers are conferred, there is an implied compact between the State and the corporators that the property which they are given the capacity to acquire for corporate purposes under their charter shall not be taken from them and appropriated to other uses. If the State grants property to the corporation, the grant is an executed contract, which cannot be revoked. The rights acquired, either by such grants or by any other legitimate mode in which such a corporation can acquire property, are vested rights, and cannot be taken away.

\*  \*  \*  \*  \*

"This restriction is not the less applicable where corporate powers are abolished than it is in other cases; and whatever might be the nature of the public property which the corporation had acquired, and whatever the purpose of the acquisition, the legislature, when by taking away the corporate authority it became vested with the control of the property, would be under obligation to dispose of it in such manner as to give the original corporators the benefit thereof by putting it to the use designed, if still practicable, or to some kindred or equally beneficial use having reference to the altered condition of things." Cooley's Constitutional Limitations (7th Ed.), vol. 1, pp. 502 to 507.

The quotation from Judge Cooley's work is made by him applicable to all classes of municipal corporations, including those of a quasi character. When he writes directly on school districts and other quasi-municipal corporations, he declares the same rule as to property. Cooley's Constitutional Limitations (7th Ed.), vol. 1, pp. 508, 509, 563, 565.

It was said by different judges in their separate opinions in the Dartmouth College Case, 4 Wheaton, 518, that the power of the Legislature over the property of corporations purely public was not absolute or unlimited, and it is now established that though such property is subject to very broad legislative legislation, its confiscation or diversion is prohibited by both the federal and state constitutions. Pearson v. State, 56 Ark., 148, 19 S. W., 499, 35 Amer. St. Rep., 91, 92; Cooley's Constitutional Limitations (7th Ed.), vol. 1, pp. 499 to 502.

Judge Story in his opinion in the Dartmouth College Case, supra, said in substance that while it may be admitted that corporations for mere public government, such as towns, ctities, and counties, may in many respects be subject to legislative control, "it will hardly be contended that, even in respect to such corporations, the legislative power is so transcendent that it may, at its will, take away the private property of the corporation, *or change the uses of its private funds acquired under the public faith.*" In part he also said:

"If a municipal corporation be capable of holding devises and legacies to charitable uses (as many municipal corporations are), does the legislature, under our forms of limited government, possess the authority to seize upon those funds, and appropriate them to other uses, at its own arbitrary pleasure, against the will of the donors and donees? From the very nature of our governments, the public faith is pledged the other way; and that pledge constitutes a valid compact; and that compact is subject only to judicial inquiry, construction, and abrogation. This Court have already had occasion, in other causes, to express their opinion on this subject; and there is not the slightest inclination to retract it. Terret v. Taylor, 9 C., 43 (3 L. Ed., 6501); Town of Pawlet v. Clark, 9 C., 292 (3 L. Ed., 735).

\* \* \* \* \*

"*The truth is, that the government has no power to revoke a grant, even of its own funds, when given to a private person, or a corporation, for special uses. It cannot recall its own endowments granted to any hospital, or college, or city, or town, for the use of such corporations.* The only authority remaining to the government is judicial, to ascertain the validity of the grant, to enforce its proper uses, to suppress frauds,, and, if the uses are charitable, to secure their regular administration through the means of equitable tribunals, in cases where there would otherwise be a failure of justice." 4 Wheaton, 695, 698; Cooley's Constitutional Limitations (7th Ed.), vol. 1, pp. 550, 501. (Italics ours).

Judge Dillon, in his exhaustive work on municipal corporations, after adverting to the power of the Legislature over municipal corporations, states: "That property acquired and owned by a municipal corporation by legislative consent is not subject to an unlimited power of the legislature over it, is consonant with natural justice. The need of having property and of property rights is one of the main reasons why municipal corporations are created. This is strongly expressed by Savigny in respect of municipal corporations in ancient Rome. If a municipal corporation, as representing a distinct community, be regarded as a *legal person,* the legislature in effect says to it, 'You may at your own expense acquire property'; and if it acts on such permission, the courts may, perhaps, fairly deduce a contract that the legislature, while it may regulate or change the uses of such property, will not deprive the corporation of it. Accordingly, the weight of opinion seems to be in favor of the doctrine that there may be, in such corporations, rights under contracts and grants which are beyond destruction by the legislature, though not beyond legitimate legislative authority and control." Dillon on Municipal Corporations (5th Ed.), vol. 1, p. 186, sec. 111, and cases cited in the notes.

After discussing the question quite at length, Judge Dillon states his own conclusion in a summary of the rule as follows: "It is believed by the author, for the reasons suggested in this chapter, that while the legislature has full power of legitimate regulation and control, it cannot deprive them (that is, in essence, the *people* of the locality at whose expense it has been acquired or for whose benefit it was granted) of such property. It is in effect fastened with a trust for the incorporated municipality as long as the legislature suffers it to live, and for the benefit of the people of the locality if the corporate entity which represents their rights shall be dissolved." Dillon on Municipal Corporations (5th Ed.), vol. 1, p. 192, sec. 112.

What has been said is consistent with the decisions in this state. In the case of Milam County v. Bateman, 54 Texas, 153, this court held that the grant of four leagues of land to the counties of the state for school purposes conferred a vested right, protected by the same constitutional guarantees which protect the property of the citizen. After advert-

ing to the fact that political rights and privileges are not within the constitutional prohibitions against retroactive laws which impair vested rights, the court in part said:

"A different principle, however, obtains as regards the rights of counties to property which they may acquire. Such rights, as a general rule, are protected by the same constitutional guarantees which shield the property of individuals. Cooley's Const. Lim., 237, 277; Grogan v. San Francisco, 18 Cal., 590.

"Even though the state itself may have donated the property, it thereby becomes such vested right as will be protected. Wade on Retroactive Laws, sec. 56; Grogan v. San Francisco, 18 Cal., 590.

"If given for a specific object, the state may very properly, as in the instance under consideration of our school lands granted to counties, exercise such supervision and control over the actions of the counties as to compel the proper execution of the trust, or prevent its being defeated; but it is believed that this control, unless by the consent of the county, should be subject to the restriction, that the purpose for which the property was originally acquired shall, as far as circumstances will admit, be kept in view; and that it shall not arbitrarily be diverted, as in the case before us, to private parties and to a wholly different purpose. Cooley's Const. Lim., 238, and authorities in note 3. In relation to these school lands, the county, through agents for the state, may be compared to agencies coupled with an interest, which cannot be revoked at the pleasure of the principal."

*   *   *   *   *

"Here the question in this connection is, that if the existing county of Milam had acquired the right to the lands in controversy, for public educational purposes, under a constitutional and statutory right common to all the counties of Texas, could the state, by the legislative act of July 21, 1870, arbitrarily take from the county this land and give it to private parties and for a private purpose?

"That the state could not do this because it would impair a vested right, we think beyond question."

A similar holding was made by the Court of Civil Appeals in the case of Simpson v. Pontotoc C. C. Line School Dist., 275 S. W., 449, 450, 451 (writ refused); Ellwood v. Stallcup, 57 Texas Civ. App., 343, 122 S. W., 906 (writ refused), is to the same effect. That the rights of school districts as trustees for their inhabitants are vested rights is also shown by our statutes, which require an adjustment of property rights between districts where by change of boundaries the school properties of one district are placed within the limits of another. R. S., 1925, art. 2804; Washington Heights I. School Dist. v. City of Fort Worth (Texas Civ. App.), 251 S. W., 341; Lyford Ind. School Dist. v. Willamar Ind. School Dist. (Texas Civ. App.), 34 S. W. (2d) 854. In such a case the funds raised by local taxation are to be apportioned. Porter v. State, 78

Texas, 591, 14 S. W., 79. Other authorities support the rule we have announced. Trustees of Vincennes University v. State, 14 Howard (U. S.) 268, 14 L. Ed., 416; Board of Education v. Blodgett, 155 Ill., 441, 40 N. E., 1025, 31 L. R. A., 70, 73, 46 Am. St. Rep., 348; State of Indiana v. Township, 6 Ind., 83; Kent's Commentaries (13th Ed.), vol. 2, sec. 306, p. 419, and notes p. 420; McQuillin on Municipal Corporations (2d Ed.), vol. 1, secs. 189, 238, 243, 245, 257. We have carefully read and considered all authorities to which able counsel have directed our attention, but the length of this opinion prevents a review thereof.

On the whole, we believe there can be no doubt that the school districts and cities having charge of their schools, such as the city of Dallas, as trustees for their inhabitants, have a vested right in the lands, buildings, and other properties of their schools; that they have a similar vested right in their public school funds from every source, including those derived from local taxation, county school funds, and apportionments from the state available school fund. Public schools, however, are in a general sense state schools and subject to reasonable regulation. 24 R. C. L., p. 558, secs. 2, 3; Webb County v. School Trustees, 95 Texas, 131, 65 S. W., 878. For more than fifty years statutes have been in effect permitting transfers from one school district to another, and some consideration must be given to the construction of the Constitution which the enactment of these statutes implies. Since the Constitution does not permit the taxation of the people of a school district for the support of that district, except upon a vote of the people of the district, it is not debatable that the Legislature cannot compel one district to use its funds and properties for the education of scholastics from another district, without just compensation. However, in view of the long operation of the transfer statutes, we believe that where a school district has facilities and teachers in excess of those necessary for its own scholastics, the state has the power to require it to accept transfers from another district, but only upon the payment of reasonable compensation therefor. Authorities, supra; Irvin v. Gregory, 86 Ga., 605, 13 S. E., 120, and other cases cited in the opinion of the Court of Civil Appeals; Slocomb v. Cameron, etc., Dist., 116 Texas, 288, 288 S. W., 1064. The Legislature, however, is without power to compel any district to provide additional facilities, teachers, etc., for the education of scholastics from another district.

It is well settled that the Legislature is without power to require counties, cities, and towns to pay an arbitrary price for labor or commodities; *that the power thus to confiscate the property of citizens is not one of the powers of that body over municipal corporations, nor the legitimate use of such corporations as agencies of the state.* Cooley's Const. Lim. (7th Ed.), vol. 1, notes p. 506; Street v. Varney Elec. Supply Co., 160 Ind., 338, 66 N. E., 895, 61 L. R. A., 154, 98 Am. St. Rep., 325; People v. Coler, 166 N. Y., 1, 59 N. E., 716, 52 L. R. A., 814, 82

Am. St. Rep., 605. For the same reason a school district cannot be compelled to render a service to a non-resident scholastic for less than a reasonable tuition fee. Such an attempt on the part of the Legislature to thus confiscate the property of its taxpayers would not be a legitimate use of such a quasi-municipal corporation as an agency of the state. As to what would be reasonable compensation, must depend upon the facts of each particular case. We do not think that, as a matter of law, any element which enters into the cost of the school system, or the expense of its maintenance, can be excluded in determining what would be a reasonable compensation, although in special cases, where the admission of non-resident scholastics would be of compensating advantage to the district, a less amount than that found upon a consideration of all factors might be reasonable. The law before us excludes from view, in the determination of a proper charge for transferred scholastics, everything except the actual cost of teaching service, and then limits the tuition fee to $7.50 per month, even though the cost of that service might be in excess of this amount, as it is in excess of it in the case of the Dallas schools. If we should say that this statute is mandatory, and regardless of other factors which are necessary to be considered in determining what would be a reasonable tuition fee, the city of Dallas must accept transferred pupils under it, then we would be compelled to say that the statute is unconstitutional and void. We think, however, in view of the construction we have given the act, that is that it applies only to pupils subject to the transfer statutes, its validity may be sustained to the extent of permitting it to apply to those districts whose trustees have decided that the acceptance of non-resident scholastics at a rate not in excess of the statutory amount will not be a detriment and may be of advantage to their districts and compensatory for the facilities and services rendered. In other words, under our interpretation of the act, in connection with the transfer statutes, a sound discretion is left to the local school boards to determine whether or not, in view of all the circumstances surrounding their districts, the admission of non-resident scholastics will be prejudicial to the scholastics of their districts, and whether or not the statutory fee would be compensatory. The discretion to be exercised by the local boards is quite similar to that which the statute has always permitted them to exercise with reference to the admission of "pupils over and under scholastic age, either in or out of the district" into their schools. The control of our publici schools has always been vested in local boards, and at no time have they had the right to admit pupils who pay tuition, when such admission would be prejudicial to the free school pupils of their districts. R. S., 1879, art. 3757; R. S., 1895, art. 3960; R. S., 1911, art. 2902; R. S., 1925, art 2905. The purpose of these statutes was not only to fix a sound public policy, but to make certain that the free school funds and properties would be devoted solely to the education of scholastics entitled thereto within the

district or city. This reason, the basis of those statutes, makes it necessary for the local trustees to exercise a similar authority in the admission or rejection of non-resident scholastics who seek admission by transfer under the act before us. This discretion to be exercised by the local boards will not be disturbed by the courts, except in cases of manifest abuse. Todd v. Board of Education, 54 N. D., 235, 209 N. W., 369, 371; 24 Ruling Case Law, p. 575, sec. 24.

We are therefore of the opinion:

First. That non-resident scholastics can attend the schools of Dallas county only when they come within the transfer statutes heretofore referred to. The relators from Tarrant, Fannin, and Rockwall counties do not come within any of these statutes, and are not entitled to any relief.

Second. That only scholastics within the scholastic age are entitled to attend the public schools free, and can be transferred only in compliance with the terms of some one of the various transfer statutes we have heretofore named.

Third. Giving the statute involved (article 2678 as amended) the interpretation we have given it; that is, that its application is limited to scholastic of free school age subject to transfer, and that the admission of non-resident scholastics is subject to the exercise of the discretionary powers of local boards, as heretofore stated, the act is not necessarily unconstitutional, but may apply under the rules hereinbefore stated.

Fourth. That the refusal of the Dallas School Board to admit the Dallas county relators into its high schools was not, under the record before us, an abuse of discretion, and will not be disturbed.

It follows from what we have said that we are of the opinion that the Court of Civil Appeals made a correct disposition of this case, and the judgment of that court is accordingly affirmed.