IN THE SUPREME COURT OF 
TEXAS


No. 02-0427
  
West Orange-Cove Consolidated 
I.S.D., et al., Petitioners
v.
Felipe Alanis, in his Official 
Capacity as The Commissioner of Education, et al., Respondents

On Petition for Review from the Court of Appeals for the Third District 
of Texas
  

Argued on March 27, 2003

Justice Smith, dissenting.
In the 1989-1990 school year, 
during which this Court issued its landmark Edgewood I decision, 
funding for primary and secondary education in Texas totaled $15.3 billion. Tex. 
Educ. Agency, Snapshot 1990: 1989-90 School District Profiles, at 19 (1991). 
Since that decision, the funding disparity among school districts has decreased 
significantly, and student test scores and other indicia of educational quality 
have increased statewide. However, like all government services, education costs 
money. By the 2000-2001 school year, total funding for primary and secondary 
education had risen to $35.4 billion. Tex. Educ. Agency, Snapshot 2001: 2000-01 
School District Profiles, at 28 (2002). Another truism regarding government 
services is that taxpayers supply virtually all of the money required to deliver 
those services. 
Article VIII, section 1-e of the Texas Constitution prohibits a state 
property tax. In this case, four school districts, nominally representing the 
taxpayers of their respective districts, assert that the state's public school 
finance system violates article VIII, section 1-e. However, the purpose of the 
litigation is not to vindicate taxpayers' rights. Rather, the acknowledged 
purpose is to bring several billion dollars of additional "resources" (a/k/a tax 
revenue) into the school finance system.
In resolving this case, the Court makes several fundamental errors. However, 
because this appeal is being determined on an expedited basis, I am able to 
fully address only three of those errors. 
First, the Court decides a case over which it lacks subject matter 
jurisdiction. Taxpayers can bring their own lawsuit if it is in their best 
interests. Therefore, the plaintiff school districts should be denied standing 
to sue.
Second, brushing aside the rulings of the district court and the court of 
appeals, and ignoring its own relevant precedent and persuasive precedent of 
other state supreme courts, the Court holds that school districts have a legal 
obligation to comply with the general diffusion of knowledge standard contained 
in article VII, section 1 of the Texas Constitution. The holding transforms this 
putative taxpayer suit brought under article VIII, section 1-e into an article 
VII, section 1 "adequacy" challenge. Nobody, including the taxpayers of the 
plaintiff school districts, should be fooled by this constitutional sleight of 
hand.
Finally, the Court reaffirms its narrow construction of article VIII, section 
1-e, and in substance validates once again the much maligned "Robin Hood" 
component of the state's public school finance system. The Court's stated 
defense of adherence to the "rule of law" will ring hollow to those Texans 
saddled with paying excessive property taxes that are both inequitable and 
unconstitutional.
In my view, the Court's resolution of this case is unfair to Texas taxpayers 
and represents a setback for Texas constitutional jurisprudence. Accordingly, I 
respectfully dissent.
I
Standing  
The plaintiffs, four independent school districts, are political 
subdivisions of the State. They have sued the State contending generally that 
the public school finance system violates article VIII, section 1-e of the Texas 
Constitution. Specifically, the school districts assert that they have lost all 
"meaningful discretion" in setting their maintenance and operations tax rate and 
therefore "the statutory cap on the M&O tax rate has become a statewide ad 
valorem tax." The only judicial relief sought by the plaintiffs is a declaration 
that the "statutory cap on M&O tax rates constitutes an unconstitutional 
statewide ad valorem tax."
A
In Texas Association of Business v. Air Control Board, 852 S.W.2d 
440 (Tex. 1993), this Court stated:
Subject matter jurisdiction is essential to the 
authority of a court to decide a case. Standing is implicit in the concept of 
subject matter jurisdiction. The standing requirement stems from two limitations 
on subject matter jurisdiction: the separation of powers doctrine and, in Texas, 
the open courts provision. Subject matter jurisdiction is never presumed and 
cannot be waived.
. . . .
. . . Because standing is a constitutional 
prerequisite to maintaining a suit under both federal and Texas law, we look to 
the more extensive jurisprudential experience of the federal courts on this 
subject for any guidance it may yield.
. . . .
. . . We therefore hold that standing, as a 
component of subject matter jurisdiction, cannot be waived in this or any other 
case and may be raised for the first time on appeal by the parties or by the 
court.
Id. at 443-46.
The standing test used by the federal courts requires "the party who invokes 
the court's authority to show that he personally has suffered some actual or 
threatened injury as a result of the putatively illegal conduct of the 
defendant, and that the injury fairly can be traced to the challenged action and 
is likely to be redressed by a favorable decision." Valley Forge Christian 
Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 
464, 472 (1982) (citations and quotations omitted). The standing test used by 
Texas courts requires that "(a) there shall be a real controversy between the 
parties, which (b) will be actually determined by the judicial declaration 
sought." Bd. of Water Eng'rs v. City of San Antonio, 283 S.W.2d 722, 
724 (Tex. 1955). The federal and Texas standing tests are both based in large 
part on the constitutional separation of powers doctrine. See Tex. 
Ass'n of Bus., 852 S.W.2d at 444 (citing Valley Forge 
Christian College in support of the following statement: "One limit on 
courts' jurisdiction under both the state and federal constitutions is the 
separation of powers doctrine.").
Although the federal and Texas standing tests are phrased in somewhat 
different terms, their substance is substantially similar. 
(1) For example, in both federal and Texas courts, a political 
subdivision lacks standing to pursue a claim that the state has violated its 
constitutional rights. See, e.g., Coleman v. Miller, 307 U.S. 
433, 441 (1939) ("Being but creatures of the State, municipal corporations have 
no standing to invoke the contract clause or the provisions of the Fourteenth 
Amendment of the Constitution in opposition to the will of their creator."); 
Deacon v. City of Euless, 405 S.W.2d 59, 62 (Tex. 1966) (holding that 
political subdivisions "do not acquire vested rights against the State").
However, there are some differences between federal and Texas standing 
requirements. For example, in Nootsie, Ltd. v. Williamson County Appraisal 
District, 925 S.W.2d 659 (Tex. 1996), the Court stated:
Nootsie argues that as a political subdivision of the State, the district has 
no inherent vested rights protected by the Constitutions of Texas and the United 
States. This argument misses the mark because the district does not contend that 
the statute violates constitutional rights belonging to the district. Instead, 
the district asserts an interest because it is charged with implementing a 
statute that it believes violates the Texas Constitution. This interest provides 
the district with a sufficient stake in this controversy to assure the presence 
of an actual controversy that the declaration sought will resolve.
Id. at 662 (citations omitted). The specific standing rule set forth 
in Nootsie differs from the federal rule regarding such third-party 
standing. See Smith v. Indiana, 191 U.S. 138, 148-49 (1903) 
(county auditor "charged by law with the duty of making [tax] assessment[s]" had 
no standing in federal court to challenge constitutionality of state exemption 
statute; county auditor "had no personal interest in the litigation" and "was 
testing the constitutionality of the law purely in the interest of third 
persons, viz., the taxpayers . . . .").
B
The real parties in interest in this litigation are the taxpayers of the 
plaintiff school districts. The school districts have no constitutional right 
under article VIII, section 1-e to "meaningful discretion." Cf. Robbins v. 
Limestone County, 268 S.W. 915, 917 (Tex. 1925) (holding that county has 
standing to file suit to protect its constitutionally recognized property 
interests); Milam County v. Bateman, 54 Tex. 153, 165-66 (1880) (same). 
Therefore, they have not "suffered some actual or threatened injury as a result 
of the putatively illegal conduct" of the State. Thus, the plaintiffs have no 
standing to seek a declaration that the "statutory cap on M&O tax rates 
constitutes an unconstitutional statewide ad valorem tax." See Agar 
Sch. Dist. No. 58-1 v. McGee, 527 N.W.2d 282, 285 (S.D. 1995) (school 
district lacked standing to challenge validity of property tax levy because it 
was not a taxpayer and had failed to establish any other "actual or threatened 
injury").
The plaintiffs' lack of standing is confirmed by a review of the judicial 
relief available for the alleged constitutional violation. The Court cannot 
restore the school districts' "meaningful discretion" (and, in substance, 
increase taxes and reduce constitutionally mandated equity) by eliminating the 
$1.50 statutory cap or increasing it to $1.75, $2.00, or some higher amount. 
See County Sch. Trs. v. Dist. Trs., 153 S.W.2d 434, 439 (Tex. 1941) 
(because it could not "be said that the Legislature would have passed any part 
of the [unconstitutional school law] with the invalid portion eliminated," the 
entire law was void). In addition, the Court cannot restore the "meaningful 
discretion" of the plaintiffs in this case by lowering either the constitutional 
general diffusion of knowledge standard or the statutory accreditation 
standards. The only available remedy for a proven violation of article VIII, 
section 1-e is an order enjoining the collection of the unconstitutional state 
ad valorem taxes. 
(2) Such an order would not restore the school districts' "meaningful 
discretion." Because the alleged injury would not be "redressed by a favorable 
decision," the plaintiffs lack standing. See Town of Acton v. 
McGary, 356 A.2d 700, 707-08 (Me. 1976) (political subdivisions' claims 
dismissed because they were not taxpayers and "even if the State property tax 
were to be held unconstitutional in this litigation, such interests as the 
plaintiff municipalities may legitimately here assert as deserving of protection 
remain legally unaffected").
Finally, the plaintiffs' first amended original petition discloses the true 
purpose of the lawsuit:
Accordingly, Plaintiffs request that the Court enter a judgment declaring 
that the $1.50 statutory cap on M&O tax rates constitutes an 
unconstitutional statewide ad valorem tax. This constitutional deficiency cannot 
be cured simply by raising the statutory cap, because such a solution would only 
aggravate the State's overreliance on local property taxes as a means of 
financing the school system. Rather, Plaintiffs request that the State assume a 
greater responsibility for financing the school system and end its overreliance 
on the local property tax.
This Court is not empowered, as a remedy for a proven violation of article 
VIII, section 1-e, to order the State to "assume a greater responsibility for 
financing the school system." The plaintiffs do not contend otherwise.
The plaintiff school districts lobbied the 77th Legislature for increased 
education funding. When the Legislature failed to appropriate the plaintiffs' 
desired level of funding, they filed this suit. 
(3) The requested judicial declaration is sought to force the 
Legislature to raise an additional two or three billion dollars a year in tax 
revenue for primary and secondary education. 
(4)
The plaintiffs do not seek to vindicate the rights of the taxpayers in their 
districts. Rather, these political subdivisions have invoked the jurisdiction of 
Texas courts to obtain a judicial declaration that will enhance their bargaining 
position with the Legislature. Under these circumstances, the policy concerns 
that undergird both the separation of powers and standing doctrines are strongly 
implicated.
I would hold that the plaintiff school districts lack standing to seek the 
requested declaration.C
The Court's response regarding this issue reveals that Texas does not have 
much of a standing doctrine. The Court fails to discuss how its announced 
standing rule relates to either the separation of powers doctrine or the Texas 
open courts provision and, in a conclusory analysis, essentially holds that a 
political subdivision that is affected by a statute in any manner may challenge 
its constitutionality in Texas courts.
It is true that the State has not challenged the plaintiffs' standing to sue. 
However, this Court is not authorized to issue advisory opinions at the request 
of parties who lack standing. Tex. Ass'n of Bus., 852 S.W.2d at 444. 
Moreover, the Court has a constitutional duty to confirm that it has subject 
matter jurisdiction. Republic of Tex. v. Laughlin, Dallam 412 (Tex. 
1841) ("Before we are permitted to decide the several points made in this case, 
we feel it to be our duty first to dispose of a preliminary question; and that 
is, 'whether the record and proceedings before us make out a proper case for the 
interposition and decision of this Court.'"), cited with approval in 
Morrow v. Corbin, 62 S.W.2d 641, 647 (Tex. 1933).
The Court correctly notes that standing was not an issue in Edgewood 
I, Edgewood II, Edgewood III, or Edgewood IV. 
However, in each of those cases, several plaintiffs clearly had standing; 
therefore, whether the school districts had standing was not material to the 
proper resolution of the case. See Bd. of Educ. v. Walter, 390 
N.E.2d 813, 826 (Ohio 1979) (plaintiff students had standing to challenge 
state's public school finance system; court noted that question of whether 
plaintiff school board lacked standing was not dispositive, and therefore "the 
issue does not merit extended analysis"). In Edgewood I, Edgewood 
II, and Edgewood IV, article VII, section 1 of the Texas 
Constitution was at issue, and the plaintiffs included students (and their 
parents) who had standing to seek a declaration that the state's school finance 
system violated that provision. Similarly, in Edgewood III and 
Edgewood IV, article VIII, section 1-e was at issue, and several 
plaintiffs were taxpayers who had standing to seek a declaration that the system 
was unconstitutional.
The Court "see[s] no difference in the standing of an appraisal district to 
assert its claims in Nootsie and the standing of the school districts 
here." ___ S.W.3d at ___. However, there are material differences. The most 
important difference is that, unlike the appraisal district in Nootsie, 
the plaintiff school districts in this case are attempting to simultaneously 
represent groups that have conflicting interests. In addition to taxpayers, 
school districts represent their students and employees. Taxpayers generally 
prefer lower taxes, while students and employees generally prefer more education 
spending.
As a general rule, litigants should not be allowed to assert the rights of 
third parties. In this case, the plaintiffs represent groups with conflicting 
interests. And the real parties in interest, the districts' taxpayers, are 
capable of filing their own lawsuit if it is in their best interests. 
Accordingly, the plaintiff school districts should be denied standing to sue on 
behalf of their taxpayers. Cf. Wright, Miller, & Cooper, Federal 
Practice and Procedure: Jurisdiction 2d § 3531.11, at 25-26 (2d ed. 1984) ("In 
this setting, it may seem tempting to adopt by analogy the third-party standing 
doctrine that permits an association to borrow standing from injured members. 
Residual concerns of federalism and political theory, however, counsel against 
simply adopting this rule. Risks remain that a state may be choosing sides 
between different groups of citizens with conflicting interests, and may not 
represent the interests of the injured citizens as well as should be.").
At a minimum, because the plaintiffs' standing is unclear, the Court should 
have raised the issue sua sponte, requested supplemental briefing, and fully 
addressed it. See Tex. Ass'n of Bus., 852 S.W.2d at 443 
("Because TAB's standing to bring this action is not readily apparent, and 
because our jurisdiction as well as that of the trial court depends on this 
issue, we requested supplemental briefing on standing . . . .").
The Court holds that the plaintiffs have standing. Despite my contrary view, 
I address other issues because of the public importance of this case.
II
Article VIII, Section 1-e
Article VIII, section 1-e was added to the Texas Constitution in 1968. It has 
been amended twice, once in 1982 and again in 2001. The section currently 
provides that "[n]o State ad valorem taxes shall be levied upon any property 
within this State." Tex. Const. art. VIII, § 1-e.
A 
Before Carrollton-Farmers Branch Independent School District v. Edgewood 
Independent School District, 826 S.W.2d 489, 520 (Tex. 1992) (Edgewood 
III), no Texas court had ever "addressed a challenge brought under article 
VIII, section 1-e." With limited analysis of the text, purpose, and history of 
the provision, this Court held:
An ad valorem tax is a state tax when it is imposed 
directly by the State or when the State so completely controls the levy, 
assessment and disbursement of revenue, either directly or indirectly, that the 
authority employed is without meaningful discretion. How far the State 
can go toward encouraging a local taxing authority to levy an ad valorem tax 
before the tax becomes a state tax is difficult to delineate. Clearly, if the 
State merely authorized a tax but left the decision whether to levy it entirely 
up to local authorities, to be approved by the voters if necessary, then the tax 
would not be a state tax. The local authority could freely choose whether to 
levy the tax or not. To the other extreme, if the State mandates the levy of a 
tax at a set rate and prescribes the distribution of the proceeds, the tax is a 
state tax, irrespective of whether the State acts in its own behalf or through 
an intermediary. Between these two extremes lies a spectrum of other 
possibilities. If the State required local authorities to levy an ad valorem tax 
but allowed them discretion on setting the rate and disbursing the proceeds, the 
State's conduct might not violate article VIII, section 1-e. It is difficult, 
perhaps impossible, to define for every conceivable hypothetical precisely where 
along this continuum such taxes become state taxes. Therefore, if the 
Legislature, in an effort to remedy Senate Bill 351 with as few changes as 
possible, chose to inject some additional element of leeway in the assessment of 
the CED tax, it is impossible to say in advance whether that element would 
remove the tax from the prohibition of article VIII, section 1-e. Each case must 
necessarily turn on its own particulars. Although parsing the differences may be 
likened to dancing on the head of a pin, it is the Legislature which has created 
the pin, summoned the dancers, and called the tune. The Legislature can avoid 
these constitutional conundra by choosing another path altogether.
Id. at 502-03 (emphasis added). 
In Edgewood Independent School District v. Meno, 917 S.W.2d 717, 
737-38 (Tex. 1995) (Edgewood IV), with no additional analysis of the 
text, purpose, or history of article VIII, section 1-e, the Court applied the 
aforementioned Edgewood III language and concluded inter alia that a 
school district would lack "meaningful discretion" if the so-called "ceiling" 
and "floor" became the same. In the pertinent paragraph, the Court stated:
However, if the cost of providing for a general 
diffusion of knowledge continues to rise, as it surely will, the minimum rate at 
which a district must tax will also rise. Eventually, some districts may be 
forced to tax at the maximum allowable rate just to provide a general diffusion 
of knowledge. If a cap on tax rates were to become in effect a floor as well as 
a ceiling, the conclusion that the Legislature had set a statewide ad valorem 
tax would appear to be unavoidable because the districts would then have lost 
all meaningful discretion in setting the tax rate.
Id. at 738.
B 
In this case, it is undisputed that the ceiling is the $1.50 statutory cap 
and that the statutory accreditation standards serve as one measure of the 
floor. However, whether the constitutional general diffusion of knowledge 
standard is an alternative measure of the floor is sharply contested.
The State and the intervenors assert, and the courts below held, that school 
districts are forced to meet only the accreditation standards, and therefore the 
general diffusion of knowledge standard is irrelevant for purposes of article 
VIII, section 1-e. The plaintiffs assert and this Court holds that the floor may 
be either the accreditation standards or the general diffusion of knowledge 
standard. ___ S.W.3d at ___.
In its final order, the district court stated:
Thus, in determining whether the Legislature has 
imposed a state ad valorem tax, the only constitutionally relevant inquiry is 
whether the Legislature has compelled --directly by levy or indirectly by 
program mandate--a tax rate of $1.50. Regardless whether the Legislature should 
raise the accreditation standards, the districts are only legally required to 
meet those standards. Because the Legislature only compels a district to meet 
accreditation standards, the court must determine whether a tax rate cap has 
become a floor and a ceiling only by reference to the accreditation 
standards.
To escape the force of this logic, the plaintiffs 
seize upon the "general diffusion of knowledge" language in the "however" 
paragraph containing the changed-circumstances warning. Under this language, the 
plaintiffs seek to establish: 1) what educational program is necessary for a 
true general diffusion of knowledge, 2) what such a program costs, and 3) that 
it takes at least, if not more than, what the state now gives the districts plus 
what the districts can raise at a $1.50 tax rate.
In interpreting "a general diffusion of knowledge" 
in this way, the plaintiffs are taking the language out of context. In the 
"however" paragraph, the Supreme Court uses the term "general diffusion of 
knowledge" synonymously with the accreditation standards, not as a separate 
standard. The Court comes to this conclusion for two reasons.
First, as explained above, the logic of the Supreme 
Court's reasoning compels this conclusion. The school districts are under no 
legal obligation to fund what they may believe necessary in their hearts for a 
general diffusion of knowledge. The school districts are only legally obligated 
to fund what the Legislature has determined in the accreditation standards is 
required for a general diffusion of knowledge.
Second, the Supreme Court expressly says it is 
equating the accreditation standards with a general diffusion of knowledge. 917 
S.W.2d at 730 n. 9. In Edgewood IV, when discussing a state ad valorem 
tax, the Supreme Court uses the terms interchangeably because it found that the 
Legislature had defined the one as the other.
Modified Final Order at 30-31. The court of appeals, with limited analysis, 
reached the same conclusion as the district court on this issue. See 78 
S.W.3d 529, 536-39.
With no direct support, this Court concludes that "[t]he public school system 
the Legislature has established requires that school districts provide both an 
accredited education and a general diffusion of knowledge." ___ S.W.3d at ___. 
In substance, the Court holds that school districts have a legally enforceable 
duty to meet the constitutional standard imposed directly on the Legislature by 
article VII, section 1 of the Texas Constitution. That holding is inconsistent 
with several of this Court's constitutional precedents. See, e.g., 
Webb County v. Bd. of Sch. Trs., 65 S.W. 878, 880 (Tex. 1901) (article VII, 
section 1 "devolves the duty of establishing and maintaining public free schools 
upon the legislature, and shows that the function of such establishment and 
maintenance was to be performed by state agencies"); El Dorado Indep. Sch. 
Dist. v. Tisdale, 3 S.W.2d 420, 422 (Tex. Comm'n App. 1928, judgm't 
adopted) (article VII, section 3 powers given Legislature as means to accomplish 
mandate of article VII, section 1, including authority to provide "'for the 
management and control of the public school or schools of such districts,'" are 
"continuing, and in nature they are such as not to be delegable").
In addition, the conclusion that school districts have a legal obligation to 
satisfy duties imposed directly on the legislative branch by a state 
constitutional provision is inconsistent with the jurisprudence of other states. 
For example, in Danson v. Casey, 399 A.2d 360 (Pa. 1979), the School 
District of Philadelphia and parents of children attending the district's 
schools challenged the constitutionality of the state's public school finance 
system. The plaintiffs alleged that, in violation of article III, section 14 of 
the Pennsylvania Constitution, 
(5) the statutory funding scheme failed to provide the school district 
with adequate revenue. Holding that the school district lacked standing, the 
Court stated:
It is obvious, however, that appellant School 
District of Philadelphia has failed to allege that it has suffered any legal 
harm from its projected financial deficit. The School District argues that it 
has a duty to provide a certain level of educational services which it cannot 
fulfill because of the effect of the statutory funding scheme. This argument 
must fail. The School District has no greater duty to provide education for the 
children of Philadelphia than the Legislature has delegated to it. It would be 
unreasonable to conclude that a greater duty has been delegated than that which 
the Legislature, through the statutory funding scheme, has provided the school 
district the means to fulfill.
Id. at 365 (citation omitted); see also Roosevelt Elem. Sch. 
Dist. No. 66 v. Bishop, 877 P.2d 806, 813 (Ariz. 1994) ("[N]othing in art. 
XI prohibits the legislature from delegating some of its authority to 
other political subdivisions of the state to help finance public education. But 
there is nothing in art. XI, § 1 that allows the state to delegate its 
responsibility under the constitution.") (emphasis in original); 
City of New York v. State, 655 N.E.2d 649, 654 (N.Y. 1995) ("Surely, it 
cannot be persuasively argued that the [plaintiff school board and other 
municipal entities] should be held accountable either under the Equal Protection 
Clause or the State Constitution's public Education Article by reason of the 
alleged State underfunding of the New York City school system over which they 
have absolutely no control.") (citation omitted).
I would hold that the constitutional general diffusion of knowledge standard 
is relevant only to a challenge brought against the State under article VII, 
section 1 and, conversely, that the standard is irrelevant to a challenge 
brought solely under article VIII, section 1-e.
In its response regarding this issue, the Court offers nothing new. The 
reality is that school districts are required to meet only the statutory 
accreditation standards. The aspirational mission statement found at the 
beginning of the Education Code, and cited only in part by the Court, does not 
mention school districts. See Tex. Educ. Code § 4.001(a). And even if 
the mission statement is read to apply directly to school districts, the Court 
has referenced no means by which anyone may enforce it. How school districts, in 
the complete absence of any enforcement mechanism, are "forced" by either the 
Texas Constitution or the Education Code to comply with the constitutional 
general diffusion of knowledge standard remains unexplained.C A 
review of Edgewood III, Edgewood IV, and the prior proceedings 
in this case leaves me with a firm conviction that the Court's "meaningful 
discretion" test must be reconsidered. The test is inflexible and incapable of 
easy application. 
(6) More importantly, it is only marginally tailored to the text, 
purpose, and history of article VIII, section 1-e. Finally, while this Court is 
obviously not required to follow precedents of other state courts, it is 
instructive that our decisions regarding article VIII, section 1-e differ 
significantly from the construction given similar provisions contained in other 
state constitutions.
In Cramer v. Sheppard, 167 S.W.2d 147 (Tex. 1942), after reviewing 
the historical evidence concerning the constitutional provision at issue, the 
Court stated the following general principles of constitutional 
interpretation:
The rule has long prevailed in this State that 
constitutional provisions should not be given a technical construction which 
would defeat their purpose. The meaning of a constitutional provision is fixed 
when it is adopted, and it is not different at any subsequent time. It should be 
construed in the light of the conditions existing at the time of adoption. We 
cannot question the wisdom of a constitutional provision. If the meaning of the 
language of a constitutional provision is plain, the courts must give full 
effect thereto, without regard to the consequences.
Id. at 154 (citations omitted).
In 1962, the Texas Commission on State and Local Tax Policy issued a 
legislatively mandated report on the state property tax. The influential report, 
which is widely credited with leading to the complete abolition of the state 
property tax, stated:
Providing More Local Revenue
Late in 1958, the Hale-Aiken Committee of 
Twenty-Four (established by the Legislature to make recommendations for 
improving public education) proposed that:
"The State should make additional tax resources 
available to counties and to local school districts by withdrawing completely 
from the field of ad valorem taxation."
Speaking before the Texas Municipal League in 
October 1961, Governor Daniel said:
". . . it is my opinion that the time is near at 
hand when the State should step completely out of the ad valorem tax field and 
leave that source entirely to cities and other political subdivisions."
Note that these statements do not say that 
abandonment of the State tax is the answer to all local fiscal problems; only 
that abandonment might give some of the more hard-pressed communities a little 
more fiscal elbow room.
It is a fact that most states that have abandoned 
the property tax as a source of State revenue have done so largely because they 
wished to allow local governments the exclusive use of this tax. In recent years 
nearly all of the states, and Texas has not been an exception, have greatly 
expanded their programs of State aid to local governments, particularly to local 
school districts. To many it seems anomalous for the State to collect large sums 
from the one tax source that most local governments have at their disposal and 
then distribute this back to the local governments in the form of grants-in-aid. 
Certainly if one purpose of the State aid program is to give relief to property 
taxpayers, this is an odd and contradictory way to accomplish the goal. 
Tex. Comm'n on State & Local Tax Policy, The State Property Tax 10-11 
(Dec. 1962).
During this era, the most influential treatise on state and local taxation 
was Cooley's The Law of Taxation. 
(7) In that authority, the distinction between state taxes and local 
taxes, and the proper use of each, was described as follows: 
A state purpose must be accomplished by state 
taxation, a county purpose by county taxation, and a public purpose for any 
inferior district by taxation of such district. This is not only just but it is 
essential. To any extent that one man is compelled to pay in order to relieve 
others of a public burden properly resting upon them, his property is taken for 
private purposes, as plainly and as palpably [as] it would be if appropriated to 
the payment of the debts or the discharge of obligations which the person thus 
relieved by his payments might owe to private parties. "By taxation," it is said 
in a leading case, "is meant a certain mode of raising revenue for a public 
purpose in which the community that pays it has an interest. An act of the 
legislature authorizing contributions to be levied for a mere private purpose, 
or for a purpose which, though it be public, is one in which the people from 
whom they are exacted have no interest, would not be a law, but a sentence 
commanding the periodical payment of certain sums by one portion or class of 
people to another." This principle has met with universal acceptance and 
approval because it is as sound in morals as it is in law.
1 Cooley, The Law of Taxation, § 314, at 653-54 (4th ed. 1924) (footnotes 
omitted). 
In 1967, the Legislature adopted a proposed constitutional amendment 
regarding the state property tax. The proposed amendment adding section 1-e to 
article VIII provided:
1. From and after December 31, 1978, no State 
ad valorem taxes shall be levied upon any property within this State for State 
purposes except the tax levied by Article VII, Section 17, for certain 
institutions of higher learning.
2. The State ad valorem tax authorized by Article 
VII, Section 3, of this Constitution shall be imposed at the following rates on 
each One Hundred Dollars ($100.00) valuation for the years 1968 through 1974: 
[setting forth a rate that declines in each of those years] and thereafter 
no such tax for school purposes shall be levied and collected. . . .
Tex. S.J.R. 32, § 1, 60th Leg., R.S., 1967 Tex. Gen. Laws 2972 (emphasis 
added). The emphasized text reflects two important points: 1) the proposed 
amendment generally prohibited the levy of ad valorem taxes for "state 
purposes"; and 2) it provided for the gradual abolition of the state property 
tax for education. 
(8)
The proposed amendment adding section 1-e to article VIII was placed on the 
November 5, 1968 ballot. Before the election, the Texas Legislative Council 
(9) published an analysis of the proposed constitutional amendments. 
With regard to the state property tax amendment, the publication set forth the 
following arguments:
For:
1. The state ad valorem tax has long been the 
subject of attack on the basis that it is poorly and inequitably administered. 
Certainly, under-evaluation, evasion, and lack of uniformity in the assessment 
rate from county to county, among different kinds of property within the same 
county, and among individual owners of the same kind of property in the same 
county do exist in many instances. Adoption of the proposed amendment would 
overcome these inequities in keeping with the constitutional mandate that 
taxation be "equal and uniform." (Article VIII, Section 1)[.]
2. Complete abolition of the state ad valorem tax 
by gradual reductions over a period of years, as proposed by Amendment No. 7, 
would create no undue pressure on the state fiscal structure. It would 
benefit counties and local subdivisions of the state, now finding it ever harder 
to meet growing government needs with present revenue sources, by making the ad 
valorem tax exclusively available to them.
Against:
1. Phasing out of the ad valorem tax at a time when 
it is ever harder to obtain funds needed for state government operations, as 
proposed by Amendment No. 7, would necessitate an increase in other taxes, 
possibly the state sales tax, to provide compensating revenues. Tax experts are 
already predicting an increase in the present sales tax, and further increases, 
in view of the one percent levied by most Texas cities, would overburden those 
least able to pay.
2. The ad valorem tax, though it may sometimes be 
inequitably assessed, is drawn from those most able to pay. Abolition of the tax 
would inevitably benefit the "haves" at the expense of the "have nots."
Tex. Leg. Council, 14 Proposed Constitutional Amendments Analyzed, at 24 
(general election Nov. 5, 1968) (emphasis added).
The League of Women Voters of Texas prepared a similar analysis of the 
proposed amendments. With regard to the state property tax amendment, it 
stated:
For:
The state ad valorem tax, a subject of controversy 
for a long time, is wasteful, inefficient, and inequitable. Complete abolition 
of the state ad valorem tax by a series of gradual reductions would create no 
undue pressure on the state to find new sources of revenue. The proportion of 
total revenue receipts from ad valorem taxes has dropped steadily from .0301 
cents per dollar in 1960 to .0242 in 1966. The ad valorem tax levied for 
general-revenue purposes was abolished in 1951.
Abolition would benefit local governments 
struggling to meet growing demands for services on a limited tax base, by making 
the ad valorem property tax exclusively available to them.
Against:
The phasing out of the state ad valorem tax at a 
time when Texas is constantly seeking new sources of revenue to meet the ever 
increasing cost of government could jeopardize the financial structure of the 
state.
The state ad valorem tax is paid by property 
owners, who are usually in a financial position to support public services. The 
creation of new sources of revenue would undoubtedly add to the burden of those 
least able to pay.
14 Important Reasons to Vote, Austin Am.-Statesman, Nov. 3, 1968, at 
A10 (setting forth verbatim the analysis prepared by the League of Women Voters 
of Texas) (emphasis added).
The state's major newspapers also provided information regarding the proposed 
amendments. For example, the Austin American-Statesman reported:
One of the longstanding goals of Gov. John 
Connally's administration has been abolishment of the state ad valorem tax, and 
that issue is the basis for the seventh amendment on the ballot this year.
. . . .
The chief argument against the state ad valorem tax 
is that there can be no uniform or fair means of assessment of collection. 
Under-evaluation, lack of conformity and out-right evasion has long plagued this 
tax.  
Adoption of the amendment, it is argued, would 
overcome these inequities and keep taxation "fair and uniform."
It also would make ad valorem taxes exclusively 
available to the cities and counties to aid in their financial burdens.
Arguing against the amendment, it is pointed out 
phasing out this tax simply would mean another tax from another source to gain 
needed funds to operate state government.
It also is maintained the ad valorem tax is drawn 
from those most able to pay, and doing away with it would benefit the "haves" at 
the expense of the "have nots."
Jerry Hall, Texas Voters Must Decide on Pollution, Tax Issues, 
Austin Am.-Statesman, Oct. 26, 1968, at 44 (emphasis added).
The proposed constitutional amendment adding section 1-e to article VIII 
passed by a vote of 1,251,528 to 700,078. The provision's original text and the 
available historical evidence establish that the principal purpose and intent of 
article VIII, section 1-e at the time of its adoption was to prohibit the levy 
of ad valorem taxes for state purposes, thereby leaving the property tax for the 
exclusive use of the state's political subdivisions. Historical evidence 
regarding the 1982 and 2001 amendments to article VIII, section 1-e reflects 
that neither was intended to modify the provision's fundamental purpose and 
intent. 
(10)
D 
 Nothing in the text or history of article VIII, section 1-e 
mandates that the level of state control over an ad valorem tax levy be absolute 
before the provision is violated. Thus, the Court's narrow construction of the 
provision, and the resulting "meaningful discretion" test, produces results that 
are inconsistent with the provision's text, purpose, and history.
For example, although they clearly conflict with the fundamental purpose and 
intent of article VIII, section 1-e, the wealth-equalization provisions 
contained in Chapter 41 of the Education Code have been found to pass 
constitutional muster under the Court's "meaningful discretion" test. 
See Edgewood IV, 917 S.W.2d at 737-39. But see id. at 
757 n.15 (Enoch, J., concurring & dissenting) (concluding that the system 
violates article VIII, section 1-e and stating that "[w]hat is determinative is 
that the State mandates the local tax and uses the revenues thus generated for 
state purposes"); id. at 765 (Hecht, J., joined by Owen, J., concurring 
& dissenting) (concluding that the system violates article VIII, section 1-e 
and noting that "[t]he State's control of redistributing local revenues is no 
different than it was under Senate Bill 351").
A Legislative Budget Board publication describes the wealth-equalization 
provisions as follows:
For the 2001-2002 school year, districts with per 
pupil property wealth that exceeds $300,000 are able to generate more than 
$30.00 per WADA per penny of tax effort without state assistance. These 
districts are often referred to as "Chapter 41 Districts." This ability to raise 
more revenue per tax effort is capped, however. In 1993 Senate Bill 7 
established the "share the wealth" provision. Statute [sic] requires districts 
with per pupil property values that exceed $300,000 to share their wealth by 
choosing one of the following five "recapture" options:
1. Consolidate with another (poorer) district.
2. Detach property to another school district for 
taxation purposes.
3. Purchase average daily attendance credits from 
the state. The cost of a credit depends on a calculation that approximates the 
amount of tax revenue raised per child in the Chapter 41 District.
4. Contract for the education of non-resident 
students (partner with a poorer district). The cost of educating a non-resident 
depends on a calculation that approximates the amount of tax revenue raised per 
child in the Chapter 41 district.
5. Consolidate its tax base with one or more other 
districts.
The two most commonly employed choices are buying 
attendance credits from the state (writing the state a check), or sharing 
revenue with another district (writing a district a check). In the 2001-02 
school year, there are 101 Chapter 41 districts. The associated recapture 
revenue realized by the state is anticipated to total $1.31 billion in the 
2002-03 biennium.
. . . .
Almost all districts that have been subject to 
recapture since 1995 have elected to apply options (3) purchasing attendance 
credit from the state; or (4) contract for the education of non-resident 
students. (The one exception is the Tuloso-Midway ISD, which deeded industrial 
property to Corpus Christi ISD in 1993-Option 2).
Tex. Leg. Budget Bd., Financing Pub. Educ. in Tex. Kindergarten Through Grade 
12 Legislative Primer, at 23-34 (3d ed. 2001).
In its final order in the Edgewood IV litigation, the district court 
stated: "[T]he Love analysis supports counting recaptured dollars as 
state aid as discussed at page 23. These dollars were obtained by the state in a 
trade with the property-rich districts. They are now properly characterized as 
state dollars." Revised Opinion at 32. Similarly, the Texas Education Agency 
publication Snapshot 2000 states: "Beginning with the 1993-94 school 
year, state revenue also includes revenues collected from districts exercising 
one of the wealth equalizing options. . . . These local tax dollars were 
redistributed as state aid." Tex. Educ. Agency, Snapshot 2000: 1999-2000 School 
District Profiles, at 28-29 (2000) (included in the record as defendants' 
exhibit number one).
Under article VII, sections 1 and 3 of the Texas Constitution, the State and 
each school district share responsibility for funding the education of the 
district's students. Therefore, in Texas, the funding of primary and secondary 
education is generally a mixed state and local purpose. However, at a minimum, 
each Chapter 41 district fully satisfies its responsibility when it funds one 
hundred percent of the cost of educating its own students. In addition, this 
Court has held that a school district is constitutionally prohibited from 
funding the education of students who reside in other school districts. Love 
v. City of Dallas, 40 S.W.2d 20, 27 (Tex. 1931) ("Since the Constitution, 
art. 7, § 3, contemplates that districts shall be organized and taxes levied for 
the education of scholastics within the districts, it is obvious that the 
education of nonresident scholastics is not within their ordinary functions as 
quasi-municipal corporations."). Thus, equalization among school districts of 
access to education funding is solely a state purpose. See id. at 26 
("[T]axes levied in school districts and cities for school purposes were and are 
levied for the benefit of the district or city, or the inhabitants thereof, and 
not for the school system of the state generally.").
The State is prohibited by article VIII, section 1-e from levying an ad 
valorem tax for any state purpose. Moreover, that provision was adopted in part 
to abolish the state property tax for education. Therefore, the Texas 
Constitution clearly prohibits the State from directly levying an ad valorem tax 
for the purpose of equalizing funding among school districts.
This Court has repeatedly held that the State may not accomplish indirectly 
what it is prohibited from doing directly. See Edgewood III, 
826 S.W.2d at 503 ("[A]rticle VIII, section 1-e prohibits the State from doing 
indirectly through CEDs what it cannot do directly, that is, levy an ad valorem 
tax."); Love, 40 S.W.2d at 27 ("[T]o say that the Legislature can 
compel a district to admit nonresidents without just compensation would be 
permitting that department to do indirectly what it admittedly cannot do 
directly."); Jernigan v. Finley, 38 S.W. 24, 26 (Tex. 1896) ("The 
legislature cannot do by indirection what it cannot do directly.").
The manifest intent and effect of Chapter 41 of the Education Code is to 
divert local ad valorem taxes to the state treasury and to use those funds to 
accomplish what is solely a state purpose. Accordingly, the wealth-equalization 
provisions in Chapter 41 of the Education Code violate article VIII, section 
1-e. Cf. Love, 40 S.W.2d at 28 (power of the Legislature over school 
district property is not "absolute or unlimited" and "though such property is 
subject to very broad legislative legislation, its confiscation or diversion is 
prohibited by both the federal and state Constitutions"); Buse v. 
Smith, 247 N.W.2d 141, 155 (Wis. 1976) (holding recapture component of 
state's public school finance system unconstitutional, court stated that "the 
state cannot compel one school district to levy and collect a tax for the direct 
benefit of other districts, or for the sole benefit of the state").
This conclusion is consistent with the Court's analysis in Edgewood II 
regarding the interplay of the relevant constitutional provisions:
On motion for rehearing, plaintiff-intervenors 
request that we modify our opinion to overrule Love v. City of Dallas, 
120 Tex. 351, 40 S.W.2d 20 (1931), or interpret that case "in a manner that 
would permit the [state-wide] recapture of local ad valorem revenues for 
purposes of equalization." We believe Love is sound and decline to 
overrule or modify it. Moreover, the interpretation requested by 
plaintiff-intervenors would violate the Texas Constitution. Accordingly, we 
overrule the motion for rehearing.
In Love, this Court held that the City of 
Dallas could not be compelled to educate students who resided outside of the 
city's school district. We held that article VII, section 3 of our Constitution 
only "contemplates that districts shall be organized and taxes levied for the 
education of scholastics within the districts." 120 Tex. at 367, 40 S.W.2d at 
27.
. . .
Our Constitution clearly recognizes the distinction 
between state and local taxes, and the latter are not mere creatures of the 
former. The provision that "[n]o State ad valorem taxes shall be levied upon any 
property in this State," Tex. Const. art. VIII, § 1-e, prohibits the Legislature 
from merely recharacterizing a local property tax as a "state tax." Article VII, 
section 3, however, states that "the Legislature may authorize an 
additional ad valorem tax to be levied and collected within all school 
districts heretofore formed or hereafter formed, for the further 
maintenance of public free schools, and for the erection and equipment of school 
buildings therein." Tex. Const. art. VII, § 3, (emphasis added). These 
constitutional provisions mandate that local tax revenue is not subject to 
state-wide recapture.
Edgewood Indep. Sch. Dist. v. Kirby, 804 S.W.2d 491, 499 (Tex. 1991) 
(Edgewood II) (opinion on rehearing).
The poor correlation between the text, purpose, and history of article VIII, 
section 1-e and the implementing test created by this Court in Edgewood 
III and Edgewood IV reflects that the test should be abandoned or, 
at a minimum, substantially modified.
E  
Several other states have constitutional prohibitions similar to 
article VIII, section 1-e of the Texas Constitution, yet none of those states 
determines whether a tax is improper by examining the political subdivision's 
"meaningful discretion" or the control exercised by the state over the act of 
taxation itself. Rather, in these states, whether a tax is an unconstitutional 
state ad valorem tax depends on whether the tax serves state or local 
purposes.
The Oklahoma Constitution provides that "[n]o ad valorem tax shall be levied 
for State purposes, nor shall any part of the proceeds of any ad valorem tax 
levy upon any kind of property in this State be used for State purposes." Okla. 
Const. art. X, § 9(a). To ensure that local ad valorem taxes are used 
exclusively for local purposes, this provision makes clear that no part of the 
tax money may be allocated for the benefit of the state. The Oklahoma Supreme 
Court has concluded that "[w]hether Article 10, Section 9, is being violated 
depends upon whether county funds are being spent for a State, rather than a 
county, purpose." State ex rel. Dep't of Human Servs. v. Malibie, 630 
P.2d 310, 316 (Okla. 1981). The court has consistently applied that test to 
determine whether an ad valorem tax violates section 9(a). See, e.g., 
State ex rel. Jordan v. City of Bethany, 769 P.2d 164 (Okla. 1989) 
(holding that article X, section 9 prohibited legislatively directed 
cost-of-operations sharing for performance of autopsies as part of felony 
homicide prosecutions, an exclusive state service and duty, because the 
legislature was attempting to divert municipal and county revenues to assist in 
the funding, or partial funding, of state services); see also Pease v. Bd. 
of County Comm'rs, 550 P.2d 565 (Okla. 1976); St. Louis-San Francisco 
Ry. Co. v. Tillman County Excise Bd., 208 P.2d 576 (Okla. 1949); Excise 
Bd. v. Chicago, R.I. & P. Ry. Co., 34 P.2d 268 (Okla. 1934). In fact, 
the court has concluded that the state may regulate the process by which the 
county raises and distributes ad valorem tax revenue so long as it does not 
allocate any portion of that revenue for state purposes: "The county is governed 
by state law in the manner in which it raises and distributes ad valorem tax 
revenue. While the state can regulate this process, it cannot - because of 
express constitutional prohibition - allocate ad valorem tax revenue for the 
benefit of the state." Bd. of County Comm'rs v. City of Muskogee, 820 
P.2d 797, 805 (Okla. 1991), overruled on other grounds by Clay v. Indep. 
Sch. Dist. No. 1, 935 P.2d 294 (Okla. 1997). Thus, the purpose of the tax, 
not the state's degree of control over the taxation process, is 
determinative.
The Nebraska Constitution provides that "[t]he state shall be prohibited from 
levying a property tax for state purposes." Neb. Const. art. VIII, § 1A. The 
Nebraska Supreme Court has noted that "[t]he purpose of this section was to 
require the state, after the adoption of sales and income taxes, to leave the 
realm of property taxation." Swanson v. Dep't of Educ., 544 N.W.2d 333, 
340 (Neb. 1996); see also Craig v. Bd. of Equalization, 164 N.W.2d 445, 
448 (Neb. 1969) ("The meaning of the constitutional prohibition is 
related to the national scene of state-local relations."). The court recognized 
that "[f]unding most, if not all, county functions has served state purposes" 
and "[f]ederal, state, and local governments have joined to combat conditions of 
common concern" such that "conceptual stratification of operations by state and 
local governments seems ill-suited to the reality of vertical integration." 
Craig, 164 N.W.2d at 448. Nevertheless, the court confirmed that 
"stratification is the central arch of the constitutional prohibition." 
Id. Thus, the court has concluded that whether a property tax is 
constitutional turns "on a determination of whether the controlling and 
predominant purposes are state purposes or local purposes." State ex rel. W. 
Neb. Technical Cmty. Coll. v. Tallon, 219 N.W.2d 454, 460 (Neb. 1974).
Because the focus lies on the purpose of the tax, the Nebraska Supreme Court 
has determined that "[t]he levy of a property tax by a local governmental unit 
should not be treated as a state levy for state purposes merely because the 
Legislature has authorized or required the local governmental unit to make the 
levy." R-R Realty Co. v. Metro. Utils. Dist., 166 N.W.2d 746, 748 (Neb. 
1969). Conversely, the court has also held that "where the Legislature has 
authorized and required local governmental units to make a property tax levy for 
state purposes, it should not be treated as a local levy for local purposes 
merely because it is made by a local governmental unit." Tallon, 219 
N.W.2d at 460. In other words, "the Legislature cannot circumvent an express 
provision of the Constitution by doing indirectly what the Constitution 
prohibits it from doing directly." Rock County v. Spire, 455 N.W.2d 
763, 770 (Neb. 1990).
The Florida Constitution provides that "[n]o state ad valorem taxes shall be 
levied upon real estate or tangible personal property." Fla. Const. art. VII, § 
1(a). Ad valorem taxation is expressly left to political subdivisions for local 
purposes: "Counties, school districts, and municipalities shall, and special 
districts may, be authorized by law to levy ad valorem taxes and may be 
authorized by general law to levy other taxes, for their respective purposes . . 
. ." Id. § 9(a). The Florida Supreme Court has held that the 
"overriding purpose" of article VII, section 1(a) "is to make a constitutional 
division of tax revenues between those available for state uses and those 
reserved for local government." Alachua County v. Adams, 702 So. 2d 
1253, 1254 (Fla. 1997). To further that purpose, the court has made it clear 
that "the legislature may not circumvent the prohibition of state ad valorem 
taxation by any scheme or device which requires local ad valorem taxes and then 
channels the proceeds into essentially state functions which are not also local 
functions." Bd. of Pub. Instruction v. State Treasurer, 231 So. 2d 1, 4 
(Fla. 1970). Thus, in deciding whether a tax amounts to a state ad 
valorem tax prohibited by article VII, section 1(a), the court has held that 
"[t]he determinative question is whether the ad valorem tax receipts are used to 
further a local purpose." St. Johns River Water Mgmt. Dist. v. Deseret 
Ranches of Florida, Inc., 421 So. 2d 1067, 1070 (Fla. 1982).
Although their constitutions have provisions similar to article VIII, section 
1-e of the Texas Constitution, these states have no test like our "meaningful 
discretion" test and have instead focused on the purpose of the ad valorem tax 
to determine whether it is constitutional. Given the similarity of language and 
intent that those provisions have to article VIII, section 1-e, the court 
decisions interpreting those provisions provide additional evidence that this 
Court should abandon its current "meaningful discretion" test and adopt an 
approach that focuses on the purpose of the disputed ad valorem 
tax.F In light of the foregoing analysis, the Court should have 
requested that the parties brief the following question: Whether the 
interpretation of article VIII, section 1-e of the Texas Constitution adopted by 
the Court in Edgewood III and Edgewood IV should be 
reconsidered?
High courts have inherent authority to, sua sponte, raise legal issues that 
are important to the proper resolution of a pending case and to request briefing 
thereon. See, e.g., Patterson v. McLean Credit Union, 485 U.S. 
617 (1988) (per curiam) (case restored to calendar for reargument and parties 
requested to brief question of whether precedent should be overruled). In 
addition, both this Court and the United States Supreme Court have consistently 
held that the doctrine of stare decisis has limited application in the area of 
constitutional interpretation.
For more than a century, this Court has recognized that the rule of stare 
decisis is not absolute and that its force varies depending on the context. In 
Willis v. Owen, 43 Tex. 41 (1875), the Court considered the 
constitutionality of a statute under which a de facto statewide property tax of 
one percent had been levied for school purposes. Although it acknowledged that 
the constitutionality of the statute had been upheld in prior decisions of the 
Court and that "[i]t may, therefore, be thought that the question should not be 
regarded by us as now open for discussion," the Court nevertheless ruled the 
statute unconstitutional. The Court explained that stare decisis could not 
dictate the outcome of the case because of the nature of the issues 
involved:
We cannot, however, regard the rule of stare 
decisis as having any just application to questions of the character 
involved in these cases. This doctrine grows out of the necessity for a uniform 
and settled rule of property, and definite basis for contracts and business 
transactions. If a decision is wrong, it is only when it has been so long the 
rule of action, as that time and its continued application as the rule of right 
between parties demands the sanction of its error. Because, when a decision has 
been recognized as the law of property, and conflicting demands have been 
adjusted, and contracts have been made with reference to and on faith of it, 
greater injustice would be done to individuals, and more injury result to 
society by a reversal of such decision, though erroneous, than to follow and 
observe it. But when a decision is not of this character, upon no sound 
principle do we feel at liberty to perpetuate an error, into which either our 
predecessors or ourselves may have unadvisedly fallen, merely upon the ground of 
such erroneous decision having been previously rendered.
The questions to be considered in these cases have 
no application whatever to the title or transfer of property, or to matters of 
contract. They involve the construction and interpretation of the organic law, 
and present for consideration the structure of the government, the limitations 
upon legislative and executive power, as safeguards against tyranny and 
oppression. Certainly, it cannot be seriously insisted, that questions of this 
character can be disposed of by the doctrine of stare decisis. The 
former decisions of the court in such cases are unquestionably entitled to most 
respectful consideration, and should not be lightly disregarded or overruled. 
And in case of doubtful interpretation, a long-settled and well-recognized 
judicial interpretation, or even legislative or executive construction within 
the sphere of their respective functions, might be sufficient to turn the 
balanced scale. But in such case the former decision or previous construction is 
received and weighed merely as an authority tending to convince the judgment of 
the correctness of the particular conclusion, and not as a rule to be followed 
without inquiry into its correctness.
Id. at 48-49.
Twenty years later, the Court revisited the rule of stare decisis and its 
application to constitutional issues. In its decision in Higgins v. 
Bordages, 31 S.W. 52 (Tex. 1895), the Court overruled a decision after 
concluding that it conflicted with a constitutional provision exempting 
homesteads from forced sale for the payment of assessments for local 
improvements. On rehearing, the Court examined its departure from precedent, 
framing the issue as follows: "Shall we uphold the constitution as it was made 
by the sovereign power of the state of Texas, or shall we uphold a decision of 
the supreme court, itself a creature of the constitution?" Higgins v. 
Bordages, 31 S.W. 803, 804 (Tex. 1895) (opinion on rehearing). The Court 
chose to overrule precedent, because to do otherwise "means to disregard the 
constitution, as we understand its provisions, and in our judgment would deprive 
citizens of a constitutional protection, provided by a convention representing 
the sovereign power of the state, which had the right to determine the policy of 
this state with regard to this question." Id. at 805.
The United States Supreme Court has also held that stare decisis cannot 
compel the outcome on constitutional questions. In Smith v. Allwright, 
321 U.S. 649, 665 (1944), the Court noted that it was "not unmindful of the 
desirability of continuity of decision in constitutional questions," but 
nevertheless recognized long-standing practice that the Court may "freely 
exercise" its power to reexamine the basis of its constitutional decisions: 
[W]hen convinced of former error, this Court has 
never felt constrained to follow precedent. In constitutional questions, where 
correction depends upon amendment and not upon legislative action this Court 
throughout its history has freely exercised its power to reexamine the basis of 
its constitutional decisions. This has long been accepted practice, and this 
practice has continued to this day. This is particularly true when the decision 
believed erroneous is the application of a constitutional principle rather than 
an interpretation of the Constitution to extract the principle itself.
Id. at 665-66 (footnotes omitted). In Payne v. Tennessee, 
501 U.S. 808 (1991), the Court again acknowledged that stare decisis is not 
absolute, especially in constitutional cases: "Stare decisis is not an 
inexorable command; rather, it 'is a principle of policy and not a mechanical 
formula of adherence to the latest decision.' This is particularly true in 
constitutional cases, because in such cases 'correction through legislative 
action is practically impossible.'" Id. at 828 (citations omitted); 
cf. Dickerson v. United States, 530 U.S. 428, 443 (2000) (stating that 
"stare decisis is not an inexorable command, particularly when we are 
interpreting the Constitution," but refusing to overrule precedent).
In Texas Association of Business v. Texas Air Control Board, 852 
S.W.2d 440 (Tex. 1993), this Court overruled an important constitutional 
precedent. With regard to the applicability of stare decisis in the 
constitutional context, the Court stated that "[a]lthough our concern for the 
rule of stare decisis makes us hesitant to overrule any case, when 
constitutional principles are at issue this court as a practical matter is the 
only government institution with the power and duty to correct such errors." 
Id. at 446.
It is clear that the stare decisis doctrine does not prevent the Court from 
reconsidering its "meaningful discretion" test.
G
With regard to whether the "meaningful discretion" test should be 
reconsidered, the Court responds that: "We find nothing in the text or history 
of article VIII, section 1-e to require that a state tax be determined by its 
purpose rather than by the extent of state control over its employment. Nor are 
we clear how such a purpose-oriented standard would operate." ___ S.W.3d at ___. 
As to the first statement, the foregoing analysis proves otherwise. The second 
statement raises a legitimate concern. However, Oklahoma, Nebraska, and Florida 
have each been able to develop and consistently apply a purpose-oriented 
standard. In contrast, this Court has accurately described the difficult task of 
applying its "meaningful discretion" test: "Each case must necessarily turn on 
its own particulars. Although parsing the differences may be likened to dancing 
on the head of a pin . . . ." Edgewood III, 826 S.W.2d at 503. In any 
event, the Court's role is not to question the wisdom of a constitutional 
provision, but simply to apply it. See Cramer, 167 S.W.2d at 
154.
Justice Douglas stated: "A judge looking at a constitutional decision may 
have compulsions to revere past history and accept what was once written. But he 
remembers above all else that it is the Constitution which he swore to support 
and defend, not the gloss which his predecessors may have put on it." Douglas, 
Stare Decisis, 49 Colum. L. Rev. 735, 736 (1949). I agree and, 
therefore, would replace the current "meaningful discretion" test with a 
purpose-oriented standard. To adhere to the Court's contrary holdings in 
Edgewood III and Edgewood IV would require me to disregard the 
fundamental purpose and intent of article VIII, section 1-e as I understand it, 
and would deprive Texas taxpayers of their constitutional rights. See 
Higgins, 31 S.W. at 805.
III
Article VII, Section 1
The Court's insistence on importing the general diffusion of knowledge 
standard of Article VII, section 1 of the Texas Constitution into Article VIII, 
section 1-e necessitates a discussion of that standard. However, because this 
appeal is being determined on an expedited basis, I am unable to fully address 
this important issue.
The Court continues to broadly interpret article VII, section 1 of the Texas 
Constitution. That provision requires the Legislature to "establish and make 
suitable provision for the support and maintenance of an efficient system of 
public free schools." Tex. Const. art. VII, § 1. The Court's interpretation of 
article VII, section 1 will require it, sooner rather than later, to determine 
the qualitative level and cost of an "adequate education" for Texas 
schoolchildren. That determination is not only one the Court was not elected to 
make, it is also one the Court is ill-equipped to handle. In any event, the 
likely result will be a decision by this Court that the current level of primary 
and secondary funding is insufficient to meet the "constitutional mandate" of 
article VII, section 1. Of course, responsibility for funding the additional 
educational services ordered by the Court will fall to Texas taxpayers.
IV
Conclusion  
The court of appeals dismissed all of the plaintiff school 
districts' claims. Because the plaintiffs lack standing to seek the requested 
judicial declaration, I would affirm the court of appeals' judgment.
 
____________________________________
STEVEN WAYNE SMITH
JUSTICE
OPINION DELIVERED: May 29, 2003 
1. Cf. Theresa M. Gegen, Note, Standing on 
Constitutional Grounds in Texas Courts: Effect of Texas 
Association of Business v. Texas Air Control Board, 47 Baylor L. Rev. 201, 
220-21 (1995) (concluding that "the Texas Supreme Court leaves undefined how far 
Texas courts should go when looking to federal standards for guidance in dealing 
with standing issues"). 
2. Without addressing its relevance to standing, the 
district court noted this fact: "Under the plaintiffs' theory, what is invalid 
is the tax itself, not the cap. . . . If the plaintiffs' complaint is that the 
Legislature has itself levied an ad valorem tax, then the only remedy is to 
prohibit the collection of the tax." Modified Final Order at 34. 
3. In the district court, the plaintiffs' attorney 
stated:
You know what they offered us? They said, But I 
tell you what, George, we'll give you an interim committee. . . . They said it's 
not on our agenda, there are other things, legislative redistricting. There are 
other things that they would choose to do rather than deal with this. And that's 
why the courts have been brought into . . . . 
4. The plaintiffs' attorney and court had this dialogue:
Attorney: I want to make this point clear to the 
Court right now--that what we're not here for--we can actually tell you from our 
pleadings what we're here for. . . .
Court: How much would it cost?
Attorney: Well, we've done--it's hard to say, 
but--
Court: It's not hard to say. We can say exactly. If 
you go to $1.55 or $1.60, or $1.70, somebody can tell us exactly what it will 
cost.
Attorney: It's in the billions of dollars, between 
[$]2 and $3 billion.
Court: So--all right. Two and three billion. And 
what was the State budget this year?
Attorney: Well, they spent 30 billion on public 
education. . . .
Court: That is the question. I mean, that's what 
Senator Ratliff probably asked you when you came over to talk to them. What are 
you going to cut? What are you going to raise? Where are you going to get $3 
billion a year?
Attorney: . . . [I]f we were to sit with Senator 
Ratliff today, I would tell him that we would have to seek additional resources. 
That might include a sales tax that was once tried and vetoed by Governor 
Clements. It could involve increased gasoline tax, it could involve an increase 
of severance taxes and it could involve a revisit of George Bush's business tax, 
which was later abandoned. Now, I am sure there are other things that could be 
done about additional resources . . . . 
5. Article III, section 14 provides: "The General Assembly 
shall provide for the maintenance and support of a thorough and efficient system 
of public education to serve the needs of the Commonwealth." Pa. Const. art. 
III, § 14. 
6. In addition to the proper measure of the floor, the 
parties and the courts below raise, debate, and ultimately disagree about 
several other issues regarding the "meaningful discretion" test. For example, 
the parties and the courts below have asserted or held that, for a school 
district to state a viable claim under article VIII, section 1-e, it must allege 
that all, something approaching or exceeding half, just some, or only one of the 
more than one thousand school districts in Texas have lost their "meaningful 
discretion." Such divergent opinions among highly qualified lawyers and judges 
indicates that the test is unsatisfactory. 
7. For example, between 1954 and 1975, The Law of 
Taxation (4th ed. 1924) was cited in ten of this Court's decisions. 
8. The Legislature was clearly aware of the impact that the 
proposed amendment would have on education funding, both state and local. For 
example, the following amendments to S.J.R. 32 were defeated in the House: 1) 
"The loss in revenue to the Available School Fund resulting from the adoption of 
this Amendment to this Constitution shall be offset by a tax on incomes of both 
natural persons and corporations . . . ." H.J. of Tex., 60th Leg., R.S. 2409 
(1967); and 2) "As the ad valorem tax levied by the State is reduced as provided 
in Section 1-e of this Article the Legislature shall have authority by general 
law to authorize and empower local school districts to levy additional ad 
valorem taxes at the same rate as the state tax rate is reduced, such taxing 
authority to be in addition and cumulative of all other taxing authority now 
permitted such school districts." Id. at 2298. 
9. The Texas Legislative Council is an agency of the 
legislative branch. See generally Tex. Gov't Code ch. 323. 
10. See Tex. H.J.R. Res. 1, § 1, 67th Leg., 2d 
C.S., 1982 Tex. Gen. Laws 52; Tex. Leg. Council, Analyses of Proposed 
Constitutional Amendments Appearing on November 2, 1982 Ballot, at 7 (purpose of 
proposed amendment to article VIII, section 1-e was to eliminate the $.10 state 
property tax for certain institutions of higher learning); Tex. H.J.R. Res. 75, 
§ 5.02, 77th Leg., R.S., 2001 Tex. Gen. Laws 6718; Tex. Leg. Council, Analyses 
of Proposed Constitutional Amendments, at 83 (general election Nov. 6, 2001) 
(purpose of proposed amendment to article VIII, section 1-e was to eliminate 
expired, and therefore unnecessary, transition provision).