# ATTORNEY GENERAL OF TEXAS

### GREG ABBOTT

May 4, 2005

Shirley J. Neeley, Ed.D.
Commissioner of Education
Texas Education Agency
1701 North Congress Avenue
Austin, Texas 78701-1494

Opinion No. GA-0321

Re: Whether an independent school district may enter into a 50-year lease with a private entity to use and improve the entity's land for school purposes in exchange for $1.00 per year and the agreement to lease excess school district land to the private entity for 50 years (RQ-0292-GA)

Dear Commissioner Neeley:

On behalf of the Port Neches-Groves Independent School District ("PNG" or "the school district"), you ask about the authority of an independent school district to enter into a 50-year lease with a private entity to use and improve the entity's land for school purposes in exchange for $1.00 per year and the agreement to lease excess school district land to the private entity for 50 years.[1]

## I. Factual Background

A letter from PNG enclosed with your request letter describes the following transaction:

> The proposed transaction involves a tract of land owned by Huntsman Petrochemicals ["Huntsman"], who has agreed to lease the land to PNG for a term of 50 years, with an option to renew the lease for an additional 50 years, at the sole discretion of PNG's School Board, in exchange for the consideration of $1.00 per year and the use of a tract of unused excess land owned by PNG. Essentially, the proposed transaction involves a long-term property exchange between the two parties.

---

[1]See Letter from Shirley J. Neeley, Ed.D., Commissioner of Education, Texas Education Agency, to Honorable Greg Abbott, Texas Attorney General (Nov. 8, 2004) [hereinafter Request Letter]; Letter from Dr. Lani Randall, Superintendent, Port Neches-Groves Independent School District, to David A. Anderson, General Counsel, Texas Education Agency (Nov. 2, 2004) (attached to Request Letter) [hereinafter PNG Letter] (both letters on file with Opinion Committee, *also available at* http://www.oag.state.tx.us).

The land owned by Huntsman is considered ideal for the possible construction of new schools and is almost twice the total acreage of land owned by PNG that would be involved in the proposed transaction. Huntsman wants the use of PNG's excess tract for the operation of the local community soccer league that would be displaced when it leases the larger tract to PNG.

PNG Letter, *supra* note 1, at 1. A brief submitted on PNG's behalf further informs us that "Huntsman will be limited to [using the school district land for the community soccer league], thus assuring that if, at the expiration of the first 50 year lease term, PNG wishes not to exercise its renewal option, the land's condition would be substantially similar to the state it would be in upon receipt by Huntsman."[2]

## II.    Analysis

PNG states "[t]his unique proposal" requires it to resolve the following question:

Whether Port Neches-Groves Independent School District can construct buildings using public funds upon property that is owned by Huntsman Petrochemicals and that is leased rather than owned and as partial consideration for such lease, provide a tract of PNG's excess and unused land to Huntsman Petrochemicals for the use as a community youth soccer program without bid or other public approval.

PNG Letter, *supra* note 1, at 1. No statute expressly authorizes a school district to enter into this kind of two-part transaction. Therefore, as PNG recognizes, we must consider separately the school district's authority to enter into each lease. *See id.* at 1-2. Accordingly we address (i) the authority of an independent school district to construct buildings on leased land that is privately owned, and (ii) the authority of an independent school district to lease excess school district land to a private entity as partial consideration for the school district leasing land from the private entity.

### A.    School District's Authority to Lease and Develop Privately Owned Land

We begin with an independent school district's authority to lease land from a private entity and to develop the land for school district purposes. The Education Code authorizes a board of trustees to lease real property on the school district's behalf. The trustees of an independent school district "as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district." TEX. EDUC. CODE ANN. § 11.151(b) (Vernon

---

[2]Brief from Chris Booth, Mehaffy Weber, on behalf of Port Neches-Groves Independent School District, to Honorable Greg Abbott, Texas Attorney General, at 1-2 (Dec. 16, 2004) ( on file with Opinion Committee) [hereinafter PNG Brief].

Supp. 2004-05). Under section 11.151(a) of the Education Code, the trustees of an independent school district "in the name of the district may acquire and hold real and personal property." *Id.* § 11.151(a). And a board of trustees has express statutory authority to spend local school funds for purposes it determines necessary, including obtaining school sites and renting schools. *See id.* § 45.105(c) (authorizing the use of certain funds for, among other things, "buying school sites, buying, building, repairing, and renting school buildings, . . . and for other purposes necessary in the conduct of the public schools determined by the board of trustees").[3] Moreover, a school district is also expressly authorized to construct school buildings, *see, e.g., id.* §§ 44.031-.041 (Vernon 1996 & Supp. 2004-05) (governing school districts' authority to enter into construction contracts), 45.105(c) (Vernon Supp. 2004-05) (authorizing use of certain funds to "build[] . . . school buildings"), and we are not aware of any statutory provision that would limit a school district to constructing school district buildings on land owned by the school district in fee simple.

In addition, PNG's letter suggests that it is concerned about constitutional limitations on the authority of a school district to use public funds to construct school buildings on privately owned land. *See* PNG Letter, *supra* note 1, at 2. Article III, section 52(a) of the Texas Constitution limits the authority of a political subdivision, including a school district, to use public funds to aid a private entity. *See* TEX. CONST. art. III, § 52(a); *Lewis v. Indep. Sch. Dist. of Austin*, 161 S.W.2d 450, 452 (Tex. 1942) ("That the School District is a political corporation or subdivision of the State, as described in Section 52 of Article 3 of the Constitution, is well established."). Section 52(a) prohibits "gratuitous payments to individuals, associations, or corporations," but "[a] political subdivision's paying public money is not 'gratuitous' if the political subdivision receives return consideration." *Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 383 (Tex. 2002). With the exception of gratuitous transactions, which are absolutely prohibited, a political subdivision's use of funds or "thing of value" that aids a private entity must serve a "public purpose" to pass constitutional muster. As the Supreme Court of Texas has recently held, in order to comport with article III, section 52(a), the predominant purpose of a statute requiring a public expenditure must be to accomplish a public purpose, not to benefit private parties, and the statute must impose public control over the funds to ensure that the public purpose is accomplished and to protect the public's investment and ensure that the political subdivision receives a return benefit. *See id.* at 383-84. This office has identified similar principles for determining if a particular expenditure serves a public purpose: "In making an expenditure of [public] funds that benefits a private person or entity, . . . a [political subdivision's governing body] will avoid violating article III, section 52 if it (i) determines in good faith that the expenditure serves a public purpose and (ii) places sufficient controls on the transaction, contractual or otherwise, to ensure that the public purpose is carried out." Tex. Att'y Gen. Op. Nos. GA-0188 (2004) at 4 (citing *Young v. City of Houston*, 756 S.W.2d 813, 814 (Tex. App.–Houston [1st Dist.] 1988, writ denied), *City of Coleman v. Rhone*, 222 S.W.2d 646, 649 (Tex. Civ. App.–Eastland 1949, writ ref'd)); GA-0078 (2003) at 4-5.

---

[3]*See also* Tex. Att'y Gen. Op. No. JM-1000 (1988) at 3, 5 (concluding that former Education Code section 23.26 authorized a school district to rent portable classrooms).

With respect to constructing buildings with public funds on leased property, this office has stated:

> It is well established that the Texas Constitution does not prohibit the state or a political subdivision from constructing improvements on leased property. [Under article III, section 52(a) and similar provisions,] . . . [a]dequate consideration for the expenditure must flow to the public, and adequate controls, contractual or otherwise, must be in place to ensure that the public purpose will be carried out. The fact that improvements are to be constructed on leased property, and the terms of the lease, are relevant to the determination whether the state receives adequate consideration for, and retains adequate control over, the expenditure.

Tex. Att'y Gen. LO-97-078, at 2 (citing Attorney General Opinions JM-1030 (1989) at 3 (expenditure of public funds to improve realty owned by private parties), MW-290 (1981) at 1, 4 (county may improve building acquired by lease), H-416 (1974) at 3 (grant or loan of state funds for construction or improvement of municipal airport located on leased land), H-403 (1974) at 3 (state agency may spend public funds to build, repair, or maintain improvements on leased property), M-512 (1969) at 2 (state agency may refurbish leased building)).

Whether using public funds to construct buildings on leased land comports with these requirements involves questions of fact and cannot be resolved by this office. *See id.*[4] Based on the information you have provided, it appears that the PNG board of trustees could reasonably conclude that constructing school buildings on the leased land would serve a school district purpose. *See* PNG Letter, *supra* note 1, at 1-2 (stating that the Huntsman tract is ideal for school construction and that a 100-year lease term would exceed the structures' useful life). Your letter also suggests that the lease agreement would grant the school district an exclusive right to use the buildings for 50 to 100 years. Such a lease term could fulfill the PNG board of trustees' obligation to place sufficient controls on the transaction to ensure that the public purpose is carried out.

## B.     School District's Authority to Lease School Land to a Private Entity

Next, we address an independent school district's authority to lease excess school district land to a private entity as partial consideration for the school district leasing land from the private entity, which is the more complicated issue.

### 1.     *The Education Code and Implied Authority*

A board of trustees holds school property in trust to be used for the benefit of school children in the district. *See Love v. City of Dallas*, 40 S.W.2d 20, 26 (Tex. 1931). Section

---

[4]*See generally* Tex. Att'y Gen. Op. Nos. GA-0128 (2003) at 5 (a question requiring resolution of particular facts is "not one in which this office ordinarily engages in the opinion process"); GA-0106 (2003) at 7 ("This office cannot find facts or resolve fact questions in an attorney general opinion.").

11.151(c) of the Education Code provides that "[a]ll rights and titles to the school property of the district, whether real or personal, shall be vested in the trustees and their successors in office. The trustees may, in any appropriate manner, dispose of property that is no longer necessary for the operation of the school district." TEX. EDUC. CODE ANN. § 11.151(c) (Vernon Supp. 2004-05). Section 11.154(a) further provides that a "board of trustees of an independent school district may, by resolution, authorize the sale of any property, other than minerals, held in trust for public school purposes." *Id.* § 11.154(a) (Vernon 1996).

While sections 11.151(c) and 11.154 authorize a board of trustees to dispose of real property that is no longer necessary for the operation of the school district and to sell property, no provision expressly authorizes a board of trustees to lease school real property to another entity. However, in *Royse Independent School District v. Reinhardt*, 159 S.W. 1010 (Tex. Civ. App.–Dallas 1913, writ ref'd), the court concluded that a board of trustees' statutory authority impliedly authorizes a board to lease school real property to another entity. In that case, the court held that the board's exclusive power to manage and control school property included the power to lease a school baseball field to the Royse Booster Club during summer months for a three-year term in exchange for the club's agreement to make certain improvements to the property. The court observed that "[t]he primary object in granting the privilege to the Royse Booster Club to use its school grounds as a place to play baseball is to subserve a public purpose, and not to promote some private end." *Royse*, 159 S.W. at 1011. Moreover, it concluded that the lease would not harm the property or interfere with school activities, given that it was limited to the summer months, and would "result in quite a financial advantage to the school district." *Id.*

Based on these facts, the court concluded that "such use [of the property] is not so inconsistent with the purposes to which the property has been dedicated or set apart as renders the contract . . . illegal or unauthorized." *Id.* Relying on *Royse*, attorney general opinions have recognized boards of trustees' implied authority to permit private groups to lease school property when the lease does not interfere with the property's school purpose. *See, e.g.*, Tex. Att'y Gen. Op. Nos. WW-1364 (1962) at 7 (concluding that a school district board of trustees was authorized to lease school property to a fire protection district so long as the lease "does not impede or interfere with the operation of the school"); O-5354 (1943) at 9 (concluding that a school district board of trustees was authorized to lease a school building to a religious sect for a summer religious school provided that the school district received reasonable consideration and the lease did not "interfere[] with the use of such property for school purposes").

While judicial and attorney general opinions after *Royse* have not questioned school district boards of trustees' implied authority to lease school district land, subsequent opinions addressing long-term leases have concluded that boards of trustees lack authority to enter into a lease that interferes with the property's use for school purposes or that relinquishes the board's authority to control the property's use. For example, in 1972 this office concluded that an independent school district lacked authority to lease an unused school facility and grounds for use as a neighborhood center for a 20-year term:

> [A] minimum twenty-year lease by the present trustees of the property
> in question, without any discretion being left in the trustees of the

future for possible needed use for school purposes, would exceed the recognized discretionary leasing authority of the school . . . . The lease would not be deemed a temporary, casual, or incidental use and would amount to an impermissible diversion of governmental property from its intended use for school purposes.

Tex. Att'y Gen. Op. No. M-1047 (1972) at 3.

And even more significantly, in 1986, in the last judicial opinion to consider a school district lease's validity, the court declared the lease ultra vires and void. *See River Rd. Neighborhood Ass'n v. S. Tex. Sports*, 720 S.W.2d 551, 559-60 (Tex. App.–San Antonio 1986, writ dism'd). In that case, the court considered a school district's authority to lease a football stadium to a private entity, STS, according to terms described in part as follows:

The lease is for a primary term of 30 years and grants to lessee, STS, the right to extend the term for two additional 10-year periods. The lease is, thus, for a minimum period of 30 years, and if STS chooses to exercise its options, for an additional 20 years.

The lease gives STS the right to the "exclusive use" of the leased premises for "all lawful purposes," without paying until at least February 1, 1986.

*Id.* at 559. The plaintiffs did not question the district's right to permit a private organization to use district property in a manner that would not interfere with the property's use for school district purposes, but contended that the lease relinquished the board's right to manage and control the property, including its right to allow other groups to use the property. *Id.* The court agreed:

There can be no doubt that [the] District's Board exceeded its powers when it, by the lease in question, effectively divested itself of the exclusive right to manage and control the property in question, including, for a period of perhaps 50 years, the exclusive right to determine when the District itself could use the school property for school purposes. The invalidity of such abdication of power and diversion of property held for public purposes has been recognized in Texas at least since 1887.

*Id.* at 560.

In sum, a school district board of trustees has implied authority under the Education Code to lease district real property to a private entity, but that authority is limited. In leasing district property, a board of trustees may not (i) permit uses of the property that would interfere with the property's use for district purposes, or (ii) divest itself of the exclusive right to manage and control the property in question. *See* Tex. Att'y Gen. Op. No. GA-0252 (2004) at 6.

With respect to the proposed lease, we disagree with the suggestion that the PNG board of trustees need not concern itself with these traditional limitations on its authority because the school district would lease its land to Huntsman as partial consideration for its lease of Huntsman land. *See* PNG Letter, *supra* note 1, at 1. Nor do we agree with PNG counsel's suggestion that any loss of control over the school district land would be mitigated by the control the PNG would gain over the larger, more valuable Huntsman tract. *See generally Love*, 40 S.W.2d at 26 (a board of trustees holds school property in trust to be used for the benefit of school children in the district).

But this does not mean that we believe that these limitations on the board's authority preclude it from leasing the school land to Huntsman, or that the school district's lease of the Huntsman tract may not be taken into account as a relevant factor in considering the school district's authority to lease its land to Huntsman. In contrast to the actively used school district facilities at issue in *Royse* and *River Road*, PNG describes the property it would lease to Huntsman as "unused excess land." PNG Letter, *supra* note 1, at 1. The fact that the land is not used by the school district is relevant to whether the proposed lease would permit uses of the property that would interfere with the property's use for district purposes. *See, e.g.,* Tex. Att'y Gen. Op. No. JM-531 (1986) at 3 (addressing a school district's authority to lease for a 50-year term undeveloped land that it did not plan to use for instructional purposes and distinguishing *River Road* on the basis that the facility in that case was actively used by school district sports teams). But the board of trustees must also consider whether PNG may need the land for school district purposes over the term of the lease and, if so, whether the lease would permit the school district to use the land. *See, e.g.,* Tex. Att'y Gen. Op. Nos. GA-0252 (2004) at 7 (concluding that a junior college district may not divest itself of the right to control campus facilities constructed under a lease); M-1047 (1972) at 3 (concluding that school district lacked authority to lease an unused elementary school for a 20-year term with no right to terminate). The PNG letter indicates that Huntsman will not agree to a lease that gives PNG the right to terminate. *See* PNG Letter, *supra* note 1, at 2. A lease divesting PNG of any right to manage and control the property for a term of 50 to 100 years is problematic under relevant precedent, unless the board of trustees can expressly find that the property is no longer necessary for the operation of the school district. *Cf.* TEX. EDUC. CODE ANN. § 11.151(c) (Vernon Supp. 2004-05) (authorizing a school district board of trustees to dispose of property "that is no longer necessary for the operation of the school district"). In making such a finding, the board of trustees could take into account the fact that the Huntsman tract would be available for school purposes.

In the end, the final determination whether a lease comports with these limitations involves questions of fact and contract interpretation and is thus beyond the purview of an attorney general opinion. *See* Tex. Att'y Gen. Op. No. GA-0252 (2004) at 6 (junior college district's authority to lease campus land to private foundation involves questions of fact and contract interpretation); *see also* Tex. Att'y Gen. Op. No. JM-531 (1986) at 2 (whether a school district's agreement to lease school district land for a 50-year term interfered with the property's school district use and the board's authority "is essentially a question of fact").[5] We suggest that the PNG board of trustees consider and make express findings regarding these issues.

---

[5]*See generally* Tex. Att'y Gen. Op. Nos. GA-0176 (2004) at 2 (attorney general opinions may "address a public entity's authority to agree to a particular contract term, if the question can be answered as a matter of law," but they do not construe contracts); GA-0078 (2003) at 2 (same).

2.     *Other Limitations on Authority to Lease School District Land*

The Local Government Code and the Texas Constitution also impose limitations on the authority of a school district to lease real property to a private entity that the board of trustees must address.

First, PNG describes the transaction at issue as a "long-term property exchange." PNG Letter, *supra* note 1, at 1. The Local Government Code requires political subdivisions, including school districts, to sell or exchange land using competitive procedures, and, in some instances, a long-term lease (or "long-term property exchange") by a political subdivision may be subject to these requirements.

Section 272.001 of the Local Government Code governs the authority of political subdivisions to sell or exchange land, generally requiring a political subdivision to provide notice and to obtain bids. *See* TEX. LOC. GOV'T CODE ANN. § 272.001 (Vernon Supp. 2004-05). Courts construe the term "political subdivision" to embrace school districts. *See City of El Paso v. El Paso Cmty. Junior Coll. Dist.*, 729 S.W.2d 296, 299 (Tex. 1987).[6] Section 272.001 "protect[s] public property in order that it might not be disposed of for less than true value. The notice and bidding requirements stimulate competition, prevent favoritism, and secure the best price for the property." *Bell v. Katy Indep. Sch. Dist.*, 994 S.W.2d 862, 866 (Tex. App.–Houston [1st. Dist.] 1999, no pet.) (citing *City of Dallas v. McKasson*, 726 S.W.2d 173, 176 (Tex. App.–Dallas 1987, writ ref'd n.r.e.); *West Orange-Cove Consol. Indep. Sch. Dist. v. Smith*, 928 S.W.2d 773, 776 (Tex. App.–Beaumont 1996, no writ)).

Specifically, section 272.001(a) requires that "before land owned by a political subdivision of the state may be sold or exchanged for other land, notice to the general public of the offer of the land for sale or exchange must be published in a newspaper of general circulation," with information about sealed bidding procedures. *See* TEX. LOC. GOV'T CODE ANN. § 272.001(a) (Vernon Supp. 2004-05). Section 272.001(b) excepts certain types of land and interests from the section 272.001(a) notice and bidding requirements, including, for example, "land that the political subdivision wants to have developed by contract with an independent foundation." *Id.* § 272.001(b)(4).[7] However, the land and interests described by section 272.001(b), including section 272.001(b)(4), "may not be conveyed, sold, or exchanged for less than the fair market value of the land or interest unless the

---

[6]The Education Code also indicates that section 272.001 generally applies to school district land sales. Chapter 45, subchapter D of the Education Code authorizes a board of trustees to sell real property and to issue revenue bonds payable from the proceeds of the sale, *see* TEX. EDUC. CODE ANN. §§ 45.081-.086 (Vernon 1996 & Supp. 2004-05), and expressly provides that Local Government Code section 272.001 does not apply to a real property sale conducted under the subchapter, *see id.* § 45.083 (Vernon 1996); *see also Bell v. Katy Indep. Sch. Dist.*, 994 S.W.2d 862, 865-66 (Tex. App.–Houston [1st Dist.] 1999, no pet.) (holding that subchapter D applies only when a school district issues revenue bonds from the land sale proceeds and suggesting that section 272.001 otherwise applies).

[7]*See also* Tex. Att'y Gen. LO-97-076, at 3 ("[A]ny contract of sale under the terms of Local Government Code section 272.001(b)(4) between a political subdivision and a private foundation for the development of a parcel of public land owned by the political subdivision must include an undertaking that the foundation will develop the land as the political subdivision determines.").

conveyance, sale, or exchange is with one or more abutting property owners who own the underlying fee simple." *Id.* § 272.001(b).

Whether a lease arrangement is a sale or exchange of land subject to section 272.001 depends upon the lease's terms, such as the lease's duration, the political subdivision's right to control the land during the lease term, and the political subdivision's right to improvements at termination. *See* Tex. Att'y Gen. LO-96-053, at 3 (noting that a court could "conclude that a transaction in which a county transfers equitable title to county real property to another entity with an irrevocable option to purchase constitutes a sale of land for purposes of section 272.001"). A court of appeals recently concluded that section 272.001 does not apply when a political subdivision temporarily leases land to a private entity. *See Walker v. City of Georgetown*, 86 S.W.3d 249, 259 (Tex. App.–Austin 2002, pet. denied). In that case, the court found that "there was no permanent disposition of land. The City of Georgetown entered into a ten-year lease, with a ten-year renewal option, during which the City retains significant control over the use of the property. Upon termination of the lease, if renewed, the City will acquire the batting cages [built on city property by the private lessee]." *Id.* at 258.

Neither the PNG letter nor its counsel's brief addresses section 272.001. *See* PNG Letter, *supra* note 1; PNG Brief, *supra* note 2. This office cannot ultimately determine whether the proposed lease at issue here would constitute a permanent disposition of land subject to section 272.001. *See, e.g.*, Tex. Att'y Gen. Op. No. GA-0252 (2004) at 8; Tex. Att'y Gen. LO-96-053, at 3 ("the determination whether a particular lease-purchase agreement constitutes a sale [subject to section 272.001] would involve questions of fact and contract interpretation and is therefore beyond the scope of an attorney general opinion"). However, the proposed lease term, 50 to 100 years with no right to terminate, suggests that the lease could rise to a sale or exchange under section 272.001. We urge PNG to consider section 272.001's requirements and exceptions before proceeding with the transaction.[8]

In addition, a school district's agreement to permit a private entity to use its land constitutes a "thing of value" for purposes of article III, section 52(a). *See Walker*, 86 S.W.3d at 260 (addressing whether city's lease of park land to private company violated article III, section 52(a)); Tex. Att'y Gen. Op. Nos. GA-0252 (2004) at 8-9 (addressing whether junior college district's lease of campus land to private foundation violated article III, section 52(a)), GA-0084 (2003) at 9 (addressing whether a city lease agreement with a volunteer firefighters association violated article III, section 52(a)), JC-0582 (2002) at 5-6 (addressing whether a county lease agreement with a museum violated article III, section 52(a)). Thus, a school district lease to a private entity must

---

[8]For example, it may be possible for the school district to enter into an agreement with Huntsman after providing notice and accepting bids for an exchange of property. *See* TEX. LOC. GOV'T CODE ANN. § 272.001(a), (d) (Vernon Supp. 2004-05) ("This section does not require the governing body of a political subdivision to accept any bid or offer or to complete any sale or exchange."). Alternatively, it may be possible for PNG to lease the school district land for an independent foundation to develop athletic fields under section 272.001(b)(4) without notice and bids. *See also* note 7 *supra*. PNG suggests that the value of the Huntsman tract equals or exceeds the fair market value of the school district land. *See* PNG Letter, *supra* note 1, at 2; TEX. LOC. GOV'T CODE ANN. § 272.001(b) (Vernon Supp. 2004-05) (generally requiring that land or an interest under subsection (b) may not be conveyed, sold, or exchanged for less than fair market value).

satisfy the public purpose test. *See, e.g.,* Tex. Att'y Gen. Op. Nos. GA-0084 (2003) at 8 (applying the public purpose test to a city lease agreement with a volunteer firefighters association), JC-0582 (2002) at 4 (applying the public purpose test to a county lease agreement with a museum).

Here, PNG asserts that in exchange for leasing its property to Huntsman, it would "obtain an interest in a valuable piece of land, without any significant cost and certainly far below fair market value." PNG Letter, *supra* note 1, at 1. It also states that the Huntsman land "is considered ideal for the possible construction of new schools and is almost twice the total acreage" of the land PNG would lease to Huntsman. *Id.* These statements indicate that the lease would serve a school district purpose, school construction, and would be supported by valuable consideration. Under these circumstances, assuming the lease includes sufficient controls to ensure the public purpose is carried out, we believe a court could conclude that the lease of school land to Huntsman would comply with article III, section 52(a). *See Walker,* 86 S.W.3d at 260 ("[T]he lease entered into here was supported by valuable consideration. As such, it was not a gratuitous donation of public funds or a thing of value.").

## S U M M A R Y

An independent school district is authorized to lease land from a private entity and to develop the land for school district purposes. An independent school district has implied authority to lease school land to a private entity, but in leasing school property the board of trustees may not (i) permit uses of the property that would interfere with the property's use for district purposes, or (ii) divest itself of the exclusive right to manage and control the property. A long-term exchange of school land for private land may be subject to section 272.001 of the Local Government Code, in which case the school district may be required to provide notice and accept bids.

Article III, section 52(a) of the Texas Constitution does not prohibit a school district from using public funds to construct buildings on leased property or from leasing school land to a private entity if the board of trustees determines that the expenditure or use of the thing of value serves a public purpose and places sufficient controls on the transaction to ensure that the public purpose is carried out.

Very truly yours,

GREG ABBOTT
Attorney General of Texas

BARRY R. MCBEE
First Assistant Attorney General

DON R. WILLETT
Deputy Attorney General for Legal Counsel

NANCY S. FULLER
Chair, Opinion Committee

Mary R. Crouter
Assistant Attorney General, Opinion Committee